T. & W. MILLER v. H. G. LAPHAM AND OTHERS.

*Water Privilege.   Mills and Mill Owners.   Deed.   Reservation. Easement.*

The plaintiffs owned a paper mill on one side of a river, and there was a grist-mill and saw-mill on the other side, the grist-mill belonging to the defendants, the three mills deriving their power from a single dam. The measure of their respective rights to the use of the water depended upon the construction of a deed in the plaintiffs' line of title, wherein the description embraced the south half of the bed of the stream and of the dam. The deed then proceeds as follows: "together with the paper-mill standing on the first mentioned premises, with all the privileges and appurtenances thereunto belonging, with all the rights and privileges on the falls where the paper-mill stands reserving to myself the grist and saw-mill thereon standing, with all the privileges

thereunto belonging." *Held* that this was a conveyance of all the water power at that point on the stream except what was reserved, and there was reserved out of the whole water power enough to answer to the privileges belonging to the grist-mill and saw-mill, whatever those privileges might be, whether half or more than half of the water flowing at any given time in the stream.

The privileges belonging to the grist-mill and saw-mill included sufficient water to operate them as they were then constructed, in low water as well as in high water.

There being no evidence in the case tending to show that, in low water, half of the water flowing in the stream, or less, would be sufficient to operate the grist-mill, the county court was not justified either from the deed or evidence in holding that the reservation was to be taken out of half of the water of the stream.

A reservation is something taken from the whole thing, covered by the general terms making the grant.

Of the said reservation, only the grist-mill and its privileges are owned by the defendants; and it is held that the measure of the quantity of water reserved is to be determined as of the date of the deed containing the reservation, and is such a quantity as was then necessary to operate the grist-mill as it was then constructed, having reference to the depth at which the water was taken from the dam, the wheel or wheels then in use, and the number of runs of stones driven.

The defendants would not be allowed to take more than this measure of water some portions of the day, and excuse themselves by showing that they used improved wheels and machinery, and thereby accomplished the work they could have done with the quantity reserved for twenty-four hours, in half that time, so that during the day they used no more of the water than they had a right to use in that time if used continuously.

The deed of the grist-mill and saw-mill provided that the "saw-mill shall never draw the water away from or injure the paper-mill * * *; nor shall the grist-mill take the water from the paper-mill to injure it in its motion, any time from 12 o'clock at noon to 12 o'clock at night." *Held* that the right of the saw-mill to the use of the water is postponed till after the right of the paper-mill is satisfied; and that in low water the grist-mill has the precedence to the paper-mill in the right to use the water from 12 o'clock at night to 12 at noon, and is postponed in the use of the water to the right of the paper-mill for the other 12 hours of the day.

*Semble.* When the titles to the dominant estate and to the servient estate unite in a common owner, the easements are merged and lost in him, and on separate conveyances of the estates by the common owner, such easements are not revived nor treated as having existed during the time the two estates were in the common owner, but are re-created by the conveyance of the estates separately, and arise from the application of the principle that whoever grants a thing impliedly grants whatever may be necessary for the beneficial enjoyment of the thing granted.

ACTION ON THE CASE, for the diversion of water from the plaintiffs' mills. Trial by jury upon the general issue—verdict for the plaintiff, September term, 1871, WHEELER, J., presiding.

It appeared that the plaintiffs' paper-mill was situate in Fairhaven, on the south side of Castleton river, and that on the north side of the river was situate a grist-mill and a saw-mill—the grist-mill belonging to the defendants—and that the water to supply these several mills was taken from a common dam across the river, the water for the paper-mill being conducted to it by means of a flume of its own inserted in the south end of the dam, and the

water for the grist-mill being conducted to it by means of a flume of its own connecting with the north end of the dam, and the saw-mill taking the water for its use from the grist-mill flume, and that such had been the respective arrangements since the earliest recollection, extending back to more than sixty years.

On the 29th of July, 1867, the defendants, being then owners of the grist-mill, erected a slate-mill for the manufacture of slate, having one wheel for its use, and took the water for such wheel from the grist-mill flume, and ran such slate-mill both by itself and sometimes while the grist-mill was running, or a part thereof, more or less, from said 29th day of July, 1867, to the commencement of this suit (January 13th, 1868), and it was for such use of the water, during the period, causing, as the plaintiffs claimed, a diversion from the paper-mill of the water belonging to it and necessary for its use, that the plaintiffs claimed to recover on the first count of their declaration. The plaintiffs did not claim to recover damages for any use of the water for the grist-mill or slate-mill while the water ran over the mill-dam, nor for such use at any time when the motion of the paper-mill wheel was not impeded thereby.

It was admitted that Matthew Lyon was originally the owner of the lands on both sides of Castleton river at this point, and of the bed of the stream, and of the entire water privilege, and that he originally built the paper-mill, the grist-mill and the saw-mill.

In order to prove title in themselves of the paper-mill and its privileges, and the relative rights of the several mills, the plaintiffs put in evidence a deed from Matthew Lyon to Smith and Hoffman, dated July 20, 1795, of the grist-mill and the saw-mill. All the other deeds in the chain of title of both parties were put in evidence, and abstracts from the same, so far as necessary, are given below.

The plaintiffs gave evidence tending to prove that in 1859, Howard, then owner of the grist-mill, deepened the channel leading to his flume by blasting out rocks, by means of which more of the water of the stream was conducted to the grist-mill and away from the paper-mill than had ever been accustomed to flow to the grist-mill, whereby the channel was so much changed that there-

after the grist-mill could draw away the water from the paper-mill so as to stop the running of the paper-mill, while previously the channel had been such that the paper-mill could draw the water away from the grist-mill; and that Howard at the same time took out one large tub wheel carrying the grist-mill, and substituted therefor four iron wheels, called Tyler wheels, which required and used much more water for the running of the grist-mill than had before been required or used, and that these same arrangements were in use by the defendants during the time of the injury complained of; that during that time (July 29, 1867, to January 13, 1868,) the water of the stream was very low, and that the defendants during that time ran their slate-mill both night and day, and their grist-mill during the day time, and sometimes during the night, sometimes a part of the wheels only, and at other times all the wheels of the grist-mill, while the slate-mill was also running, and that during that time the grist-mill and slate-mill used much more water than the paper-mill did, the full discharge of the paper-mill wheels being 1,799 feet, of the grist-mill wheels 3,240 feet, and of the slate-mill 900 feet; that the plaintiffs had help and material, except straw, and that farmers about there had straw that they could have bought, with which they could have made paper if they could have had water, and during all this time were running and attempting to run, both night and day, their paper-mill in the manufacture of paper, but that they were often obliged to stop their works from time to time, at all hours of the day, amounting in the whole to from one quarter to one half the time, for want of water to run them, and that for like reason the motion of his mill, when running, was slow, irregular and interrupted, all occasioned by such excessive use of the water by the grist-mill and slate-mill, and that, as a consequence, they sustained great damage in the loss of profits of the paper which they would otherwise have made, and in the quality of that which they did make, and in delay in getting the same to market.

The defendants' evidence tended to prove that the work so done by Howard in 1859 did not have the effect to draw the water of the stream away from the paper-mill; and the four wheels put in

by him required and used less water than had been before required
and used ; that the slate-mill was not used at any time when all
the wheels of the grist-mill were running, but that whenever the
slate-mill was running, the water was shut off from the grist-mill
wheels to an amount fully equivalent to the amount used by the
slate-mill wheel ; and that from 12 o'clock at noon to 12 o'clock
at night, the slate-mill or grist-mill did not run, nor was any water
used, unless the water of the stream was then running over the
dam ; that for fifty or sixty years last past the paper-mill and the
grist-mill had been run by the respective proprietors thereof,
during the seasons of low water and while there was not a full
supply for the use of both mills, and this under a claim of right,
by giving to the paper-mill a precedence in the use from noon to
midnight, and to the grist-mill a like precedence from midnight to
noon of each day.

The plaintiffs' testimony contradicted that of the defendants
on these two last points, viz: as to the use of grist-mill and slate-
mill from noon to midnight, when the water was not running over
the dam, and as to this alternate precedence in the use of the
water.

The evidence on both sides tended to show that the head and
fall of said stream at the dam was about fourteen feet ; that in
putting in the Tyler wheels of the grist-mill, they were set lower
than the former tub-wheel, giving them a head of about twelve
feet ; that in 1859 the plaintiffs substituted for the then tub-wheel
of the paper-mill four iron Tyler wheels, which drew the water
at a much lower level than the present wheel ; that in 1866 the
plaintiffs took out said Tyler wheels and put in their place the
present wooden wheel, called a breast or pitch-back wheel.

The plaintiffs' evidence tended to show that the water to supply
this wheel is drawn from the surface of the pond, and the wheel
cannot be run to advantage when the water is twenty inches be-
low the top of the dam ; that the head of water for this wheel is
one foot ; that this arrangement is better when there is a full sup-
ply of water, but not so well when the water is low ; and that this
wheel requires less water to carry the paper-mill than the former

or any Tyler wheels. The defendants' evidence tended to show that said wheel required more water than Tyler wheels, and was not adapted to running in low water.

The plaintiffs' evidence further tended to show that from the time of the earliest recollection of witnesses to about 1820, the grist-mill had been used as a custom mill doing a small business; that for some years between 1820 and 1830, two or three distilleries running in the neighborhood were supplied from it; that from 1830 to 1860 it was used as a custom mill; that since 1860 the proprietors of it have bought grain and ground feed for sale in addition to the custom business, and that this business has constantly increased the running of the grist-mill ever since. The defendants' evidence on this point tended to show that the running of the mill had not increased, as the plaintiffs' evidence tended to show that it had.

The defendants claimed of the court rulings and instructions as follows:

1. The defendants' title to the water and its use, ( aside from usage ), rests upon the deed of Matthew Lyon to Solomon Cleaveland of August 17, 1796, of the one half of the grist-mill, &c., and upon Matthew Lyon to Nathaniel Dickinson of September 26, 1799, of the other half of the grist-mill.

2. That this first deed conveyed not only the privilege of the half of the water which then " went" to the grist-mill, but authorized the taking of so much as might be necessary for the running of the mill, in any mode necessary, subject only to the restriction specified between 12 o'clock at noon and 12 o'clock at night; that this restriction extends no further than its terms, and so, necessarily, that deed gave the grist-mill the precedence from midnight to noon.

3. That this second deed conveys in terms what is above claimed as conveyed by the deed of the first half, viz: a precedence in behalf of the grist-mill from midnight to noon. If this deed is broader in its grant than the first, no restriction in the first can be urged against it.

4. That the deed of Lyon to Josiah Norton of the paper-mill, bearing date September 25, 1799, and the deed of Lyon to Dickinson of one half the grist-mill, dated September 26, 1799, having both been attested by the same witnesses and acknowledged before the same magistrate on the same day, ( September 26, 1799 ),

must be presumed to have been delivered the same day, or con-temporaneously.

5. Whether so or not, by the express terms of the deed of Lyon to Norton, information is conveyed to him that Lyon ( the grantor ) had sold the grist-mill and saw-mill standing on the falls where the paper-mill stood ("thereon standing"), with the privileges thereunto belonging, and that the privileges so conveyed were no part of the privileges "remaining" to him.

In order, therefore, to determine what was the paper-mill privilege granted to Norton, there must be deducted the two grants made to Cleaveland and Dickinson, and thus ascertain what "remained" in Lyon.

6. The subsequent deeds of Norton to Donahue, and of Donahue to Herring, Colton and Beaman, restrict the plaintiffs from any claim as against the deed of Lyon to Dickinson.

7. The fact that the usage of the two mills has been according to those two grants ( to Cleaveland and Dickinson ) in the division of the time of running, when there was not sufficient water for both mills, ( if found by the jury ), should be considered in interpreting the grants, if the construction is doubtful.

8. In order for the plaintiffs to establish a preference in behalf of the paper-mill from midnight to noon in the use of the water, when there was not sufficient for both mills, they must prove that the right has been so claimed adversely for fifteen years, and has during all that period been enjoyed continuously and without interruption.

9. If from midnight to noon the defendants used no more water than sufficient to fully carry the grist-mill, the plaintiff cannot recover for such use, though such water may have been used in part by the slate-mill.

10. If the plaintiffs, by the use of an unsuitable wheel or wheels, or by setting their wheel too high, or other application of the water, have disabled themselves from an advantageous use of the stream in low water, they cannot recover damages for the use of the water at such times by the defendants, if by the use of suitable wheels and other proper arrangements, the paper-mill would not have been "injured in its motion" by the use made of the water by the defendants.

The court declined so to rule, or instruct the jury, but did rule and charge upon the points made, as follows :

The deed of Salmon Norton to Donahue conveyed the paper-mill and land about it to the middle of the stream, and one half of the water of the stream. It also conveyed the other half of

the water, except the share that belonged to the saw-mill and grist-mill privileges. The share that belonged to the saw-mill and grist-mill privileges was such a share of the whole water of the stream as what they were accustomed to then use, was a share of what all the mills were accustomed to use there. This share Norton reserved out of one half the water of the stream, and conveyed the rest of that half, if any remained, and the other half, to Donahue.

What Norton conveyed to Donahue passed, so far as paper title is concerned, to Sproat & Safford, March 29, 1838. Sproat & Safford conveyed away the privilege of drawing water from the paper-mill dam sufficient to carry a bark-mill wheel, which might be erected by Howard, whenever the water should be running to waste over the dam, and whenever by so doing they should not in any wise injure or affect the operations of the paper-mill, grist-mill or saw-mill. This conveyance cut Sproat & Safford's right down to a pond full enough to run over the dam, and did not cut it down to less than that at any time when to make it less would injure or affect the paper-mill. The rest of the right of Sproat & Safford, as to the paper-mill, came to the plaintiffs, and this was the measure of the plaintiffs' right at the time complained of, unless it was varied by the acquisition of rights, one way or the other, by adverse use.

To determine how much water each of the mills was accustomed to use, July 30, 1804, for the purpose of determining how much Salmon Norton reserved out of one half the water of the stream for the grist and saw-mills, the jury must go back as far as they can upon the evidence and determine how much each used at the earliest period the evidence goes back to upon that subject, and determine how much each used at that period, and it will not be presumed that the use was changed between July 30, 1804, and that period.

The title will stand according to the paper title, unless some rights have been gained on one side and lost on the other, by adverse use of the water.

As to a claim made by the defendants to a preference in the use of the water of the stream from midnight to noon, the court ruled and charged that that could be established only by evidence of an adverse use of the water in that way for fifteen years, properly explaining to the jury what was necessary for the acquiring of such a title.

The court further charged as follows:

" Whatever right the plaintiffs are found to have had to the water from the latter part of July, 1867, to the 13th of January, 1868,

they had a right to the use of, in every way they saw fit, at any stage of the water. This is the measure of the plaintiffs' right, and they have no ground to complain of any use that was made by the defendants of the rest of the water, unless they interfered in some way with this right. Their share they were entitled to at all times ; the defendants had no right to interfere with this right at any time ; the rest of the right did not belong to the plaintiffs, and the use of that in any manner, at any stage of the water that did not take any more than the share of the water belonging to the rest of the right, would not be an interference with the plaintiffs' right. If the defendants did interfere with the plaintiffs' right, by drawing away from the plaintiffs any of the plaintiffs' share of the water, the plaintiffs are entitled to recover."

The court also charged upon the question of damages.

The several propositions above stated were fully explained to the jury. The charge upon all other parts of the case was satisfactory. To the refusal to rule and charge as requested, and to the several rulings and charge as above stated upon the several points and requests above stated, and to the charge as above stated, that whatever water was conveyed to Donahue passed, so far as paper title is concerned, to Sproat & Safford, and thence, except the bark-mill privilege, to the plaintiffs, the defendants excepted.

*Abstract of Deeds referred to in the Bill of Exceptions.*

1. *Matthew Lyon to Asa Smith and Hermon Hoffman*—Dated July 20, 1795, conveys " in equal shares my grist-mill and saw-mill in said Fairhaven, with the grounds they stand on, together with the privilege of the water that goes thereto, and a right to keep up the dam and flume necessary for said mills. Provided, that the said saw-mill shall never at any time draw the water away from, nor injure the paper-mill standing or that may stand opposite the said mills, and drawing water out of the same pond created by the same dam ; nor shall the grist-mill take the water from the paper-mill to injure it in its motion, any time from twelve o'clock at noon to twelve o'clock at night; nor shall the said grantees nor their heirs nor assigns have a right to waste the water out of the said pond created by the said dam, by keeping leaky flumes or gates on their part of the dam, and so on the other side no waste is to be made of the water by leaky flumes or gates on the south half of the dam. To have and to hold," &c.

*Deeds of Paper-Mill.*

2. *Matthew Lyon to Josiah Norton.*—Warranty deed, dated September 25, 1799, acknowledged September 26, 1799, before

Jonas Galusha, justice of the peace, and attested by Jonas Galusha and Minerva Lyon, received for record September 26, 1799 — conveys a parcel of land on the south side of Castleton river, (on which stood the paper-mill,) by metes and bounds which extend " to the river, thence up the middle of the stream until," &c. (This description, by the language aforesaid, embraces the south half of the bed of the stream and of the dam.)     The deed then proceeds as follows :   " together with the paper-mill thereon standing, with all the privileges and appurtenances thereunto belonging, with all the rights and privileges on the falls where the paper-mill stands, remaining to me, having sold the grist and saw-mill thereon standing, with the privileges thereunto belonging.     To have and to hold," &c.

3.   *Salmon Norton to Alexander Donahue.*—Warranty deed, dated July 30, 1804—conveys " the same that was set to me by the distributors of the estate of my honored father, Josiah Norton," and bounds the same as in the deed of Matthew Lyon to Josiah Norton by metes and bounds, and then proceeds : " together with the paper-mill standing on the first mentioned piece, with all the privileges and appurtenances thereunto belonging, with all the rights and privileges on the falls where the paper-mill stands, reserving to myself the grist and saw-mill thereon standing, with all the privileges thereunto belonging.     To have and to hold," &c.

4.   *Alexander Donahue to John Herring, Moses Colton and Joel Beaman.*—Warranty deed, dated March 27, 1806—conveys by metes and bounds as in Lyon to Norton, and proceeds : " together with all the buildings thereon standing, and every material appertaining to the old paper-mill and every appurtenance thereof, except as is hereinafter excepted : that is, I do not hereby convey the highway leading through said premises, nor any more privilege of water for the use of mills or water works than was conveyed by Mathew Lyon to Josiah Norton by his deed to said Josiah of the same, bearing date September 25, 1799, which may be seen on Fairhaven town records.     To have and to hold," &c.

[Sundry quit-claim deeds passed Herring & Beaman's title to Moses Colton.]

5.   *Moses Colton to George Warren and David C. Sproat.*— Warranty deed, dated January 20, 1819—conveys by metes and bounds, as above, and proceeds : " together with the paper-mill and all the other buildings thereon standing, with all the appurtenances and water privileges thereunto belonging, which water

privileges are the same that were conveyed by M. Lyon to Josiah Norton by deed bearing date September 25, 1799, and may be seen on Fairhaven town records.    To have and to hold, &c."

6.   All subsequent deeds down to Timothy Miller and William Miller, either make express reference to the deed of Lyon to Norton of September 25, 1799, as expressed in the above deed of Colton to Warren & Sproat, or refer to previous deeds for description of the grants, which previous deeds make such reference to the deed of Lyon to Norton.

### Deeds of Grist-Mill, &c.

1.   *Matthew Lyon to Solomon Cleaveland.*—Warranty deed, dated August 17, 1796—conveys " one half of the grist and saw-mill in Fairhaven, with one half of the land it stands on, and half of all the privileges and appurtenances thereunto belonging, agreeable to my deed to Smith & Hoffman, on record in the town clerk's office in this town, and subject to the same regulations and reserves, with the further privilege that the said grantee and his heirs, &c., shall have equal rights on said ground with the other owner, and in case further additions shall be made to the said saw-mill or grist-mill, the said Cleaveland, his heirs and assigns, shall have a right to enjoy the one half of the benefit of the same without further purchase.    To have and to hold," &c.

2.   *Salmon Cleaveland to Pliny Adams.*—Warranty deed, dated April 23, 1798, of same half of grist-mill and saw-mill, with same description and reference to deed of Lyon to Smith, and Hoffman for the privileges," &c.

3.   *Pliny Adams to Stephen Rogers.*—Warranty deed, dated August 10, 1799, of same premises, and same description and reference.

4.   *Stephen Rogers to James Witherell.*—Warranty deed, dated January 4, 1803—conveying " the one equal half of a grist-mill in said Fairhaven, built by Matthew Lyon, with the land it stands on, and all the other privileges to the said grist-mill, by deed of the same from said M. Lyon to Smith & Hoffman, to which reference is to be had ; to have and to hold the above granted and bargained premises with all and singular the privileges and appurtances granted in said Matthew Lyon's deed to said Smith & Hoffman," &c.

5.   *Matthew Lyon to Nathaniel Dickinson.*—Warranty deed, dated September 26, 1799, acknowledged September 26, 1799, before Jonas Galusha, justice of the peace, attested by Jonas Galusha and Minerva Lyon ; received for record April 9, 1800,

—conveys " one half of the grist-mill in Fairhaven which I built, with the land it stands on, together with the privilege of the water for the same, with the right to keep up the dam and flume necessary for said mill ; provided that the said grist-mill shall not take the water from the paper-mill, to injure its motion, from twelve o'clock at noon to twelve o'clock at night ; nor shall the said grantee nor his heirs nor assigns have a right to waste water of the pond created by the dam by keeping leaky flumes or gates on their part of the dam ; and so on the other side, no waste of water is to be made, and the said grantee, his heirs and assigns, shall have preference of the water from twelve o'clock at night to twelve o'clock at noon. To have and to hold," &c.

6. *Nathaniel Dickinson to Elial Gilbert.*—Warranty deed, dated February 1, 1803—conveying " the one half of the grist-mill in Fairhaven, built by Matthew Lyon, with the land it stands on, together with the privilege of water," &c ; ( following and copying, to the end, the language of the deed of Lyon to Dickinson above.)

7. *Elial Gilbert to James Witherell.*—Quit-claim deed, dated February 1, 1803—conveying " the equal half of a grist-mill standing in said Fairhaven, built by Matthew Lyon, with all the land, water and other privileges thereunto belonging, agreeable to Nathaniel Dickinson's deed to me of this date."

NOTE.—This deed brings the title to the whole grist-mill into James Witherell.

8. *James Witherell to Salmon Norton.*—Warranty deed, dated April 18, 1804—conveys " the grist-mill standing in said Fairhaven, near the paper-mill and saw-mill, with all and singular of the privileges and appurtenances thereto belonging or appertaining, agreeable to deed to me of the same by Stephen Rogers and Elial Gilbert, recorded in the book of records in said town, reference thereto being had. To have and to hold," &c.

9. *Salmon Norton to Joshua Quinton.*—Warranty deed, dated November 10, 1807—conveys the grist-mill and privileges, &c., " agreeable to deeds of Stephen Rogers and Elial Gilbert to James Witherell, and from James Witherell to me, as will appear in the books of record in said town, reference thereto being had."

10.—*Joshua Quinton* ( son and heir of the first Joshua ) *to William C. Kittridge, Alanson Allen, and Joseph Adams.*—Warranty deed, dated March 14, 1845—conveying " the grist-mill situated upon the lower falls upon Castleton river, with the land upon which it stands, with all the water privileges connected with said mill, together with all and singular the privileges and appurt-

enances in any wise thereunto belonging or appertaining, agreeable to deeds of the same from• James Witherell and his grantors to Salmon Norton, and from Salmon Norton to my late father, Joshua Quinton, deceased," &c.

11.. *Allen and Adams to William C. Kittridge.*—Quit.claim deed, dated October 24, 1846, of all their title under the above deed of Joshua Quinton.

12. *William C. Kittridge to Hezekiah and Harvey Howard.*— Warranty deed, dated October 17, 1853—conveying the same grist-mill, " together with the land it stands upon, &c., and all water privileges pertaining to said mill as the same are described and set forth in Joshua Quinton's deed of the same to myself, A. Allen, and J. Adams, dated March 14, 1845, * * * * and all other privileges and appurtenances of said grist-mill, as I now own and possess the same, agreeable to said Quinton's deed and the deed from said Allen and Adams to me, dated October 24, 1846."

13. The subsequent deeds, bringing the title down to the defendants, describe the grist-mill and its privileges as expressed in the foregoing deeds, or by reference to such former deeds upon record.

The deeds on both sides were duly recorded.

*Edgerton & Nicholson* and *Daniel Roberts*, for the defendants.

The question involved in this case is, what are the relative rights to the use of the water of Castleton River, as connected with the plaintiff's paper-mill and the defendant's grist-mill? This was the contention upon the trial, and the verdict was controlled by the ruling of the court upon this question.

The defendants contended that those rights were determined by and rested upon the deeds which brought the title of both mills down from Matthew Lyon, the original owner, to Salmon Norton; of the grist-mill, by deed of James Witherell, dated April 18, 1804, and of the paper-mill by the distribution of his father's —Josiah Norton's—estate, at some time (not stated) previous to July 30, 1804 (the date of his deed to Alexander Donahue), and thence to the plaintiff and defendants respectively. If these deeds control these relative rights, it is then clear that the grist-mill had a precedence of right in the use of the water from mid-

night to noon, and the paper-mill a like precedence from noon to midnight.

The defendants rest this branch of their defense upon the position taken in their first five requests, and cited Wash. Easements, 34, 35; *Knight* v. *Dyer*, 57 Maine, 174.

The defendants' contention is that the rights so created and defined by deed, structure and user, passed through Salmon Norton without merger or change, as the established privileges and appurtenances of these several mills, down to the respective parties to this suit.

The great error of the court below was in ruling that these deeds, structures and user had nothing to do in determining the respective rights of the parties, but that they were newly apportioned and granted by Salmon Norton, as the common owner, by his deed to Donahue, of July 30, 1804, disconnected with the previous deeds—that whatever rights, privileges, appurtenances, or limitations had been attached to the respective properties under previous ownership had become merged in his unity of title. This conclusion rested upon the notion that the rights claimed are easements, and that all easements are lost by unity of title, as one cannot have, as it is said, an easement in his own land. This is so, as to easements not of necessity, or not continuous, but used from time to time only, as a right to go to a well to take water. *Polden* v. *Bastard*, Law Rep. 1, Q. B. 156; or a right of way not necessary. *Plimpton* v. *Converse*, 42 Vt., 717. But this is not true as to easements of necessity, or continuous in their nature. 2 Wash. Real Prop., 344; *Watts* v. *Kelson*, Law Rep., 6 Ch. Ap. 166. The most that can be said of such is, that they are suspended during unity, but revive on severance.

But these rights claimed were not in strictness easements, but rights created by the former owner, Lyon, by disposition of the property to different ends and uses, regulating the relations of each parcel to the other, and this indicated by permanent structures and by deeds. In such case, the relations remain permanent, unless specifically changed, as characteristics and elements of the property itself—essential appurtenances. Gale & What. Easement, 39 and seq.; 3 Kent's Com., 436; *Kieffer* v. *Imhoff*, 2

Casey, 438 ; *Phillips* v. *Phillips*, 48 Penn., 178 ; *Polden* v. *Bastard*, Law Rep., 1 Q. B., 156 ; *Watts* v. *Kelson*, Law Rep., 6 Ch. Ap. 166 ; *Tucker* v. *Jewett*, 11 Conn., 311 ; *Hickox* v. *Parmelee*, 21 Conn., 86 ; *Crittenden* v. *Field*, 8 Gray, 621 ; *Vt. Cent. R. R.* v. *Hills*, 23 Vt., 681 ; *Dunklee* v. *Wilton R. R.*, 4 Foster, 489 ; Wash. Easements 56, and seq.; ib., 81 ; *Coolidge* v. *Hagar*, 43 Vt., 9.

This error led to a misconstruction of the deed of Salmon Norton to Donahue.

The court charged that this enlarged right of the paper-mill (under the court's interpretation) passed from Donahue to Sproat & Safford, and thence, (except a bark-mill privilege,) to the plaintiff. This was a plain error, as much of fact, as of law.

Upon the defendants' theory as to the main question, the defendants' 7th 8th and 9th requests should have been answered. All were refused, and the 8th was turned against the defendants.

Upon the theory that the relative rights to the use of the water belonging to the several mills are to be determined by the ancient deeds, then the defendants' 10th request should have been answered. If for the sake of a greater advantage in times of a full supply of water, the plaintiff has so arranged his wheels as to disable himself from a use of the water in times of scarcity, he cannot complain. He gets his compensation in the long run ; nor can he complain of an injury which he brings upon himself.

*C. H. Joyce* and *E. J. Phelps*, for the plaintiff.

Salmon Norton, on the 30th of July, 1804, owned both mills, and all the water-privilege on both sides of the stream. Both parties now claim under him. The precise terms of the various deeds in his previous chain of title are therefore immaterial, except so far as their language may have been afterwards adopted by way of description.

Salmon Norton, by his deed of July 30, 1804, conveyed to Alexander Donahue the paper-mill and premises (bounded to the middle of the stream), and also *all* the water privilege in the stream there, except the grist-mill and saw-mill, with "*the privileges thereto belonging.*" This conveyance was *prior* to Nor-

ton's conveyance of the grist-mill (see deed). Nothing, therefore, could pass to defendant under the latter conveyance, beyond what was reserved in this.

The county court was right in holding that this exception embraced such a share of the water as the grist and saw-mills had been theretofore accustomed to use: that is, the same proportion of the whole stream as what they were accustomed to use, was of that used by all the mills. *Crittenden* v. *Field,* 8 Gray, 621; *Rodgers* v. *Bancroft,* 20 Vt., 250; *Wilder* v. *Bennett,* 30 Vt., 670; *Gray* v. *Clark,* 11 Vt., 583; *Adams* v. *Warner,* 28 Vt., 395; *Roads* v. *Johnson,* 26 Vt.

The claim that Alexander Donahue's deed to Herring and others, ( November 27, 1806,) through which the plaintiffs claim, did not convey so large a right in the water as Donahue acquired under his deed from Norton above referred to, is erroneous. *Rogers* v. *Bancroft,* 20 Vt., 250.

It may well be denied, that Donahue in conveying all the land, premises, and appurtenances, including the bed of the stream, could legally reserve a part of the water privilege, not only without any land for it to attach to, but without any possible means by which it could ever be used, either by him or any one else.

But this question does not arise, because Lyon's deed to Norton describes the water right conveyed, in exactly the same language employed in Norton's deed to Donahue. The effect of the latter's deed to Herring, therefore, is precisely the same as if he had simply conveyed what he had acquired from Norton.

It is claimed by defendants that the term " *the privilege of the grist-mill,*" in Lyon's deed to Norton, is to have a different meaning from what it has in Norton's deed to Donahue, because by previous deeds ( not referred to by Donahue ) Lyon had conveyed the same privilege in broader terms. This proposition, if true in fact, could not affect the construction of Donahue's deed to Herring. And it is not true in fact.

The water the plaintiff was entitled to, he had a right to use in his own way. After trying both kinds of wheels, he decided to employ the one which he believed, and his evidence showed, was on the whole the best. If the defendants drew away his water

and occasioned him damages, it is no answer for them to say that if he had used wheels better adapted to a scarcity of water, his damage might have been less. He was not bound to prepare his wheels in anticipation of such an injury. Nor to use the water he had a right to, at a disadvantage, in order that if his right should be infringed he might obviate part of the loss, and so save the infringer from the consequences of his own act.

The opinion of the court was delivered by

Ross, J. In 1867 and 1868, the plaintiffs and defendants were owners of certain rights in a water power on Castleton river, at Fairhaven. July 30, 1804, Salmon Norton owned the entire water power so far as the rights of these parties are involved. There was then a paper-mill on the south side of the river, and a saw-mill and a grist-mill on the north side, all driven from a common power, created by the same dam. The former Salmon Norton had received as his distributive share, or a part of his distributive share from his father, Josiah Norton's estate ; and the latter, or at least the grist-mill, by a conveyance from James Witherell, dated April 18, 1804. Being thus the owner of the paper-mill and grist-mill, and of the power that drove the same, Salmon Norton, in conveying them, could subject either mill to such limitations in respect to the power conveyed, and to the use of the power, as he saw fit, or make the power conveyed to one servient to that conveyed to the other. It was inherent in him to carve out just such estate and power to either mill as he chose. The plaintiffs and defendants both derive their title from this common source. July 30, 1804, Salmon Norton conveyed the paper-mill with its privileges and appurtenances, with certain reservations in reference to the grist-mill and saw-mill, to Alexander Donahue, and whatever rights the plaintiffs own have come to them through various conveyances from this deed. November 10, 1807, Salmon Norton conveyed the grist-mill and privileges to Joshua Quinton, and the title and rights of the defendants have come to them, through intermediate conveyances, from this latter deed. These mills and water power were originally the property of Matthew Lyon. He had conveyed the paper-mill to one party, and the

other mills to other parties, and the title of Salmon Norton was derived from separate sources originating from Matthew Lyon. The county court held that the respective rights of the plaintiffs and defendants were to be determined by the conveyances from their common grantor, Salmon Norton. In this we think there was no-error. In thus holding, we have no occasion to discuss, at length, the question which has been urged upon our attention by the defendants' counsel, whether easements of necessity, as they are sometimes called, are merged and lost when the titles to the dominant estate and to the servient estate unite in a common owner. From a limited examination of the authorities on that subject, we think the better and more generally received doctrine is, that such easements are merged and lost in the common owner, and that on separate conveyances of the estates by the common owner, such easements are not revived, nor treated as having existed, during the time the two estates were in the common owner, but are re-created by the conveyance of the estates separately, and arise from an application of the familiar principle, that whoever grants a thing, impliedly grants whatever may be necessary for the beneficial enjoyment of the thing granted. We fail to find anything in the grants and conveyances from Salmon Norton that calls for the application of any such principle, or the decision of that question. The difficult and determinative question in the case is, not what kind of estates Salmon Norton could have carved out of this property of which he was the sole owner, or how he could have made one estate dominant, and the other servient in the use of the common water power, but what kind of estates he did in fact create, and what rights these parties have to the estates so created.

In the deed from Salmon Norton to Alexander Donahue, of July 30, 1804, the grantor describes the property conveyed as "the same that was set to me by the distributors of the estate of my honored father, Josiah Norton," and then gives the same metes and bounds which are contained in the deed from Matthew Lyon to Josiah Norton, which extend "to the river, thence up the middle of the stream" &c., so as to embrace the south half of the bed of the stream, and of the dam, and then proceeds: "together

with the paper-mill standing on the first mentioned piece, with all the privileges and appurtenances thereunto belonging, with all the rights and privileges on the falls where the paper-mill stands, reserving to myself the grist and saw-mill thereon standing, with all the privileges thereunto belonging." The county court held, against the request of the defendants, that inasmuch as the deed conveyed the land to the middle of the stream, it conveyed one half of the water of the stream for the use of the paper-mill, and so much of the other half as was not reserved; and that the reservation of the privileges belonging to the grist-mill and saw-mill, so far as the amount of water was involved, must be taken from the other half of the water of the stream. In this, we think there was error. The conveyance of the soil over which water flows ordinarily carries with it the right to use the water as an incorporeal hereditament. If the conveyance had been of the paper-mill and land to the middle of the stream and nothing more, and if half of the water in the stream then flowed over the land conveyed, the court would have been warranted in holding that the deed conveyed one half of the water of the stream. But the deed conveys more than this. After describing the land with the paper-mill and privileges and appurtenances, it proceeds, " with all the rights and privileges on the falls where the paper-mill stands, reserving" &c. It is the evident intention of the grantor on the one hand to convey all the water power at that point on the stream, except what he reserved, and on the other hand, to reserve out of the whole water power enough to answer to the privileges belonging to the grist-mill and saw-mill, whatever those privileges might be, whether half or more than half of the water flowing at any given time in the stream. The privileges belonging to the grist-mill and saw-mill included sufficient water to operate them, as they were then constructed, in low water as well as in high water. There was no evidence in the case, disclosed by the bill of exceptions, which tended to show that in low water, half of the water flowing in the stream, or less, would be sufficient to operate the grist-mill. Hence the county court was not justified, either from the deed or from the evidence, in holding that the reservation was to be taken out of half of the water of the stream. A reservation is something

taken from the whole thing covered by the general terms making the grant, and cuts down and lessens the grant from what it would be except for the reservation. Without the reservation in this deed, the whole water power, at that point on the stream, would have passed to the grantee, and the reservation is so much taken from the whole water power of the stream at that point. The terms of the grant and reservation in this case are very similar to the terms of the grant and reservation in *Rood et al.* v. *Johnson*, 26 Vt., 64. In that case the deed conveyed the land to the middle of the stream, and the water power with a reservation. The court held that the reservation was out of the whole water power, and not out of the portion not included within the boundaries in the deed. Of the reservation only the grist-mill and its privileges are owned by the defendants. When we have determined how much of the water power was reserved for the use of the grist-mill under the word "privileges," we shall have found a measure of the rights of the defendants in the water power. No question is made but the reservation included in the term privileges, as regards the water, is a measure of the quantity reserved for operating the grist-mill. We think this measure of the quantity of the water reserved is to be determined as of the date of the deed from Salmon Norton to Donahue, and is such a quantity as was then necessary to operate the grist-mill as it was then constructed, having reference to the depth at which the water was taken from the dam, the wheel or wheels then in use, and the number of runs of stones driven. *Adams et al.* v. *Warner et al.*, 26 Vt., 395. As regards the quantity, this is the measure of the defendants' rights in the water power, derived from the reservation in the deed. They would not be allowed to take more than this measure some portions of the day, and excuse themselves by showing that they used improved wheels and machinery, and thereby accomplished the work they could have done with the quantity reserved for 24 hours, in half that time, so that during the day they used no more of the water than they had a right to use in that time if used continuously. A steady flow of water yielding a constant power is valuable; for the operator knows what he can rely upon, and can arrange the machinery to be used

and the help to be employed accordingly; while an inconstant power, created by an over supply of water one hour and none another, is comparatively, if not entirely, worthless. The operator could never forecast what he could do, or how much help he could use advantageously.

It remains to determine whether the owners of the grist-mill have the right, under the privileges reserved to it, to use this quantity of the water flowing in the stream at all hours of the day, in preference to the owners of the paper-mill right with its privileges. Salmon Norton, in his deed of July 30, 1804, evidently referred to the water power as it had been parceled out by the previous owner, Matthew Lyon, and intended to grant what he had received from his father's estate, and to reserve what was conveyed to him by the deed from James Witherell. In that deed he expressly states that he conveys " the same that was set to me by the distributors of the estate of my honored father, Josiah Norton." His father had never owned the grist-mill and saw-mill. The paper-mill with its privileges his father had acquired by a deed from Matthew Lyon, dated September 25, 1799, and this was all of the water power that the distributors of his father's estate could have set out to Salmon Norton. The deed from Lyon and the deed from Salmon Norton contain the same metes and bounds and the same language in regard to privileges and rights on the falls, except in the closing part of each description. The closing part of the description in the deed from Lyon is, " with all the rights and privileges on the falls where the paper-mill stands, remaining in me, having sold the grist and saw-mill thereon standing, with the privileges thereunto belonging;" and in the deed from Norton, " with all the rights and privileges on the falls where the paper-mill stands, reserving to myself the grist and saw-mill thereon standing with all the privileges thereunto belonging."

It is quite apparent that the grant in the two deeds was intended to be and is identical, and that the reservation in the deed from Norton was intended to be, and is, identical with what is described in the deed from Lyon as having been already sold. This is consistent with the construction which Donahue gave to the grant, and Salmon Norton to the reservation. When Donahue conveyed

the property granted to him by that deed, after having used it nearly two years, while Norton owned the property reserved, he inserted: "I do not hereby convey the highway leading through said premises, nor any more privilege of water for the use of mills or water works than was conveyed by Matthew Lyon to Josiah Norton by his deed to said Josiah, of the same, bearing date September 25, 1799." Although this appears as an exception in the deed from Donahue, we think it rather an expression of his idea of what he had received by the grant from Norton. When Salmon Norton conveyed the grist-mill and its privileges to Joshua Quinton, he describes them as the same James Witherell had received from Rogers and Gilbert, and had conveyed to him. It is true Salmon Norton could not lessen his grant to Donahue by enlarging the reservation, when he subsequently conveyed it to Quinton, nor does he by the construction we have placed upon the grant and reservation. With this construction the deeds all harmonize. The county court were therefore correct in ruling that whatever water was conveyed to Donahue passed to Sproat and Safford, and thence, except the bark-mill privilege, to the plaintiffs.

The deeds from Rogers to Witherell and from Gilbert to Witherell, mentioned in the deed from Norton to Quinton, refer to the deeds from Lyon to Dickinson, and from Lyon to Smith and Hoffman. These are deeds conveying the grist and saw-mill with the privileges thereunto belonging, spoken of as having been sold in the deed from Lyon to Josiah Norton. From these deeds, Lyon to Smith and Lyon to Dickinson and Hoffman, it is apparent that the right of the saw-mill to the use of the water is postponed till after the right of the paper-mill is satisfied; and that in low water the grist-mill has precedence to the paper-mill in the right to use the water from twelve o'clock at night to twelve o'clock at noon, and is postponed in the use of the water to the right of the paper-mill for the other twelve hours of the day. Matthew Lyon in his deed of the paper-mill and privileges to Josiah Norton represents that he has already parted with the ownership of the grist and saw-mill and privileges. Norton obtains all the deed purports to convey if he takes the paper-mill and privileges with the grist and saw-mill and privileges in other owners. We think he is bound

by the representation contained in his deed as to the condition of the property. Hence it is immaterial whether the deed from Lyon to Dickinson, dated September 26, 1799, and the deed from Lyon to Josiah Norton, dated September 25, 1799, and both acknowledged September 26, before the same magistrate, and attested by the same witnesses, are to be considered cotemporaneous in execution and delivery or otherwise. Judgment of the county court is reversed, and the cause remanded.