# CASES

### ARGUED AND DETERMINED

##### IN THE

# SUPREME COURT.

---

## WHITE AND HAMMOND, EXECUTORS,

### v.

## ROLLIN AMSDEN.

---

#### OCTOBER TERM, 1893.

---

*Water power. Construction of grant. The condition of things, situation of parties and subsequent acts may be considered.*

---

1. In construing a contract the object aimed at is to discover and give effect to the intention of the parties ; and if the words are equivocal, resort may be had to the circumstances under which it was executed and the contemporaneous construction put upon it by the parties, as evidenced by possession or similar acts.

2. In 1833 the Mill Dam Company acquired title to three water privileges, known as the lower power, the middle

power and the great dam power.   At the great dam power was a large dam, used for the double purpose of furnishing a head at that point, and of storing water for the two powers below.·  In 1835 the company enacted by-laws relative to the sale and future government of the several water privileges, and from that time ·on the water was used by the various privileges in substantially the manner specified in the by-laws.   October 30, 1841, the Mill Dam Company conveyed to Wardner the lower power, with all the water and other privileges appurtenant thereto, and to Hubbard the middle power, with all the privileges and appurtenances belonging to it, both conveyances being made subject to the by-laws of the corporation.   On the same day the Mill Dam Company executed two mortgages upon the remaining property of the corporation situate at the great dam, excepting therefrom "the land covered by the great dam and by the water when the pond is full." The legal title to the property covered by said two mortgages passed by decree of foreclosure to one Lamson, who also became the owner, in 1864, of the middle power and all of the lower power except the grist mill, and who conveyed his interest, in 1865, to ·the Windsor Manufacturing . Company.   October, of the same year, that company executed to the Windsor Savings Bank two mortgages, one for ten thousand dollars upon the property at the upper ` dam, and the other for twenty thousand dollars upon the property at the middle power.   Both these mortgages were foreclosed and under the decrees the defendant obtained title to the great dam property, in 1884, and the testator of the orators to middle power property at about the same time. The property at the middle power consisted of valuable structures intended to utilize the water power derived from the great dam.   In 1885 the defendant made certain repairs upon the great dam, and claimed and collected of the owners of the middle power and the lower power that proportion of the expense of such repairs provided for by the by-laws.   The description in the mortgage, under which the defendant claims, is by reference to former deeds, adding the words, "together with the various shops, mills, dwelling houses, and other buildings thereon standing, and the steam engine, boiler and appurtenances thereto belonging and the main shafting in said buildings, and all the water power."

*Held*, that under this description, in view of the relative value of the different properties, the circumstances under which and purposes for which they had been erected, the manner in which the water power had previously been and

was then being utilized, and the practical construction put upon his rights by the defendant, later, in 1885, the defendant took, not the entire water power at the great dam, but only those rights therein to which the property there situate was entitled under the by-laws of the Mill Dam Company.

3. The merger of the different titles in a common owner between the mortgage of 1841 and those of 1865 did not, as matter of law, abrogate the by-laws under which the different privileges had been used.

4. A party who would insist upon prescriptive rights, acquired by adverse possession, in answer to the rights claimed by the orator in a suit in equity, must set up such prescription in his answer.

5. The defendant was under no personal duty, by reason of his title to said great dam property, to open and shut the gates in the great dam in accordance with the by-laws of the Mill Dam Company.

Bill in chancery. Heard at the December term, 1892, Windsor county, upon the pleadings and the report of a special master. Tyler, chancellor, dismissed the bill *pro forma*. The orators appeal.

This suit was brought to establish the rights of the orators in certain water privileges in the village of Windsor. The Ascutney Mill Dam Company, which was organized in 1833, acquired, soon after its organization, three water powers which were known respectively as the lower power, the middle power and the great dam power. At the great dam power an expensive dam some forty feet in height was erected for the double purpose of forming an extensive reservoir and thereby ponding back the water for the benefit of all three powers, and of affording a head for the mills situate at the great dam itself. Soon after its organization the Ascutney Mill Dam Company enacted certain by-laws for the regulation of the use of the water by these different privileges. Article three of these by-laws was as follows:

" Article 3. The opening and shutting of the gates at the great dam, except when there is surplusage of water, shall be regulated as follows:

During the month of

| | opened at | o'clock A. M., | shut at | o'clock P. M. |
|---|---|---|---|---|
| January, | 7 | " | 9 | " |
| February, | " 6½ | " | " 8½ | " |
| March, | " 6 | " | " 8 | " |
| April, | " 5 | " | " 7 | " |
| May, | " 5 | " | " 7 | " |
| June, | " 5 | " | " 7 | " |
| July, | " 5 | " | •• 7 | " |
| August, | " 5 | " | " 7 | " |
| September, | " 5 | " | " 7 | " |
| October, | " 6½ | " | " 8½ | " |
| November, | " 7 | " | " 9 | " |
| December, | " 7 | " | " 9 | " |

"Provided, nevertheless, that by consent of a majority of the parties in interest, estimated by the proportionate value of all the privileges, the said gates may be opened half an hour earlier or closed half an hour later in any month; and in either case said gates shall be closed half an hour at twelve o'clock M. each day. And the water, when taken from said dam, in all cases except when it runs over the coping, shall be drawn from the upper flumes now constructed; and the privilege or privileges when occupied on either side of the brook immediately connected with said dam and taking water from said flumes, shall be forever charged with the duty of opening and shutting the gates of said flumes, in conformity to the foregoing regulations.

"And the amount of water so drawn from the reservoir through said flumes shall not exceed fifty cubic feet per second at any time, and when the water has fallen to three feet below the top of the coping thirty cubic feet per second can be drawn."

The orators' testate held title to the middle privilege and the defendant held the title to the great dam privilege. The defendant claimed that under his title he was the absolute owner of the water power situated at the great dam, and that he could control the opening and closing of the gates in that dam as he saw fit, without reference to the rights of the other privileges, except the right of the grist mill situate upon the lower privilege. The orators claimed that their privilege had the same right to the use of the water now which it had originally possessed under the by-laws of the

Ascutney Mill Dam Company.   The  prayer of the bill was
that the defendant be compelled to open and close the gates
in the great dam in accordance with these by-laws, or, if the
court  was  of  the  opinion  that  no  personal  liability  rested
upon the  defendant  to so open and close said gates, that he
be enjoined from interfering with the orators in opening and
closing them in such a manner as to obtain that flow of water
to which they were entitled.

The  facts  considered  by  the  court  fully  appear  in  the
opinion.

*William Batchelder* and *J. J. Wilson* for the orators.

The grant of the  middle  power, with the buildings upon
it  and  appurtenances  belonging  to  it,  necessarily  carried
the right to use the water power, for the purpose of utilizing
which the buildings were constructed, and which had always
been  used  in  connection  with  them ;  and  the  grant  of  the
property  at  the  great  dam,  under  which  the  defendants
claimed, carried with it only so much of the water power as
was properly appurtenant to that property.   Upon a sever-
ance of  the heritage a grant will be implied of those contin-
uous and  apparent  easements  which  have been used by the
owner during the unity.   *Harwood* v. *Benton et al.*, 32 Vt.
724 ; *Perrin* v. *Garfield*, 37 Vt. 304.

The defendant cannot now raise the claim of adverse pos-
session,  since  it  has  not  been  raised  by  the  pleadings.
*Warren* v. *Warren*, 30 Vt. 530.

*W. B. C. Stickney*, *Gilbert A. Davis* and *Frank H.
Clark* for the defendant.

The defendant is under  no personal liability in respect of
the  opening  and shutting  of  the gates,  even  upon the con-
tention  of  the  orators.   *Barton* v. *Larned*,  11  Vt.  135 ;
*Westminster* v. *Willard*, 65 Vt. 266.

At the time of the execution of the two mortgages, under which the orators and defendant respectively claim, the Windsor Manufacturing Company was the owner of the entire property, and could convey by each mortgage such portion of it, with such privileges, as it saw fit. The effect of the unity of title in that company was to merge in it all the rights and easements. Washburn, Ease., ss. 516, 522; *Wilder* v. *Wheldon*, 56 Vt. 344; *Plympton* v. *Converse*, 42 Vt. 712, 717; *Hapgood* v. *Brown*, 102 Mass. 451; Wait's Act. and Def., 735.

Severance of the two estates would not necessarily revive the easement which had been formerly attached to either estate; it would be entirely a question of what the grantor actually did by its conveyances, and in determining that there is an important distinction between a natural easement and an artificial easement. In this case there was no natural, visible easement with reference to which the parties must be assumed to have contracted. The language of the defendant's grant, of " all the water power," is plain and unambiguous and should control. *Hazard* v. *Robinson*, 3 Mason 273; *Perry* v. *Parker*, 1 Woodbury and Minot 280; *Miller* v. *Lapham*, 44 Vt. 416; *Grant* v. *Chase*, 17 Mass. 443; *Albee* v. *Huntley*, 56 Vt. 354; Gould, Waters, ss. 313, 360; *Brace* v. *Yale*, 4 Allen 393; Washb., Ease., 53; Washb., R. P., 66, n. 4: Angell, Watercourses, ss. 145-147, 191.

TAFT, J. The Ascutney Mill Dam Company was chartered in 1833. After organization it acquired title to certain property, including that in question, which consisted of a large stone dam with three water privileges; one at said dam known as the upper or great dam power, and two below with dams sixteen or seventeen feet high, known as the middle and lower powers. The great dam was forty to forty-two feet high, and was built and intended for a two-

fold purpose, viz., to create a power to be used in connection with the privileges at said dam, and to store a surplus of water for the use of such privileges below the great dam as might be sold by the corporation.

The Mill Dam Company owned the land covered and flowed by the reservoir created by the great dam, and the land surrounding the reservoir. In December, 1835, the company enacted by-laws relative to the sale and future government of the water privileges that belonged to the corporation. Unless there was a surplus of water the opening and closing of the gates in the great dam for the purpose of furnishing the two lower powers with water was provided for and regulated by article three of the by-laws. On the 30th day of October, 1841, the Mill Dam Company sold and conveyed to Allen Wardner its lands at the lower power and all the water and other privileges and appurtenances thereto belonging, and to one Hubbard the lands of the company at the middle power, with all the privileges of, and appurtenances to, the same. Both conveyances were made subject to the by-laws of the corporation, but the amount of water which the grantees were entitled to draw in cubic feet per second was not set forth in the deeds of sale. On the same day, October 30, 1841, the Mill Dam Company executed two mortgages upon the remaining property of the corporation, all situate at the great dam, excepting therefrom " the land covered by the great dam and by the water when the pond is full," and reserving the right to flow contiguous lands by means of flash-boards, and of entering to repair or rebuild the dam. This conveyance covered all the privileges belonging to the corporation at the great dam, and was made subject to the by-laws of the corporation. The legal title to the property covered by said mortgages passed from the corporation by force of decrees of foreclosure, based upon said mortgages, and is now in the defendant. Thus the ownership of all the powers is derived from conveyances

executed upon the same day, October 30, 1841, and all made subject to the by-laws of the corporation, which regulated the taking of water from the great dam. Under such conveyances and the by-laws the lower powers took the right to draw water from the great dam, and the conveyance of the upper power was, under the by-laws, subject to such rights. These rights appear in the conveyances of the upper power from the fact that they were made subject to the by-laws. A party claiming title through a chain of regularly executed conveyances is bound by all that appears in such conveyances as an incumbrance upon such title. By force of this rule the defendant is bound by the recitals in the former deeds in his chain of title, that the conveyances were made subject to the by-laws of the corporation, unless he is absolved therefrom by reason of subsequently acquired rights.

The legal title to the property covered by the two mortgages executed October 30, 1841, and which is now in the defendant, passed by conveyances to E. G. Lamson, and in the latter part of the year 1864 he was the owner of the great dam power, the middle power and all of the lower power property except the grist mill. In 1864 he improved the property at the upper power by erecting a new saw mill, a drop shop and a cutlery shop.

These changes were made to utilize the water at that point instead of discharging it into the stream unused. In March, 1865, Mr. Lamson conveyed all the property then owned by him at the three powers to the Windsor Manufacturing Company, and on the 21st day of the following October that company, owning the upper and middle privileges and a portion of the lower privilege, executed to the Windsor Savings Bank two mortgages, one for ten thousand dollars upon the property at the upper dam, the other for twenty thousand dollars covering the property at the middle power.

The mortgages were executed, delivered and recorded contemporaneously and decrees of foreclosure were obtained by the bank upon both mortgages; the properties were not redeemed from either and the decree under the mortgage of the upper power was assigned to the defendant in August, 1884, and expired in December following, and his title is derived thereunder. The decree under the mortgage of the middle power expired and the property was sold to the orators' testate. The defendant claims an absolute right to all the water in the stream at the upper power; that the by-laws of the corporation have been abandoned, and the rights of the parties to this proceeding are not in any respect governed by them, except he recognizes the right of the grist mill at the lower power, as provided in the conveyance to Allen Wardner.

The title of the Windsor Manufacturing Company was derived under the two mortgages executed as above stated, in October, 1841, and each mortgage was made subject to the by-laws of the corporation, and in all of the deeds of the property that have been given since, the property is described by reference to prior deeds. The main question in controversy between the parties in this cause arises under the mortgage of the great dam power by the Windsor Manufacturing Company to the Windsor Savings Bank.

It is under this mortgage that the defendant claims title. In it the premises are described by reference to the deed to the Manufacturing Company, and there is added to the description the following words:

" Together with the various shops, mills, dwelling houses or other buildings thereon standing, and the steam engine, boiler, and the appurtenances thereto belonging, and the main shafting in said buildings and all the water power; meaning to convey hereby all of said premises so conveyed" (with an exception immaterial here).

Under the assignment of the decree under said mortgage " The defendant claims to be the owner of the great dam

and pond and all the water power, except the grist mill right, as against any adverse rights thereto or interest therein of the owners or lawful occupants of said middle falls and lower falls property and water privileges thereunto belonging."

.The defendant claims that under the words " all the water power," he has a right to all the water power created by the reservoir.

There is nothing in the description of the premises in the respective conveyances in the defendant's chain of title that can be construed as covering the land under the great dam or under the water in the pond ; therefore the defendant has no right to the same by virtue of any title derived under the assignment to him of the said decrees. The main question presented is, to what water power is the defendant entitled under the description in the mortgage deed of the upper power to the Windsor Savings Bank.

This is a question of law arising upon a construction of the deed. In construing a contract the object aimed at is to discover and give effect to the intention of the parties.

It is said in *Gray* v. *Clark*, 11 Vt., 583, " the great object, and indeed the only foundation of all rules of construction of contracts, is to come at the intention of the parties." If the words or terms of a contract are equivocal, resort may alway be had to the circumstances under which the contract was executed, and to the contemporaneous construction given to the contract by the parties, as evidenced by possession or similar acts.

The subsequent acts of the parties have always been admitted to show how the parties understood their contract and as a practical construction of it. *Gray* v. *Clark*, 11 Vt. 583 ; *Thompson* v. *Prouty*, 27 Vt. 14 ; *Barker* v. *Railroad Co.*, Ibid 766 ; *Vt. & C. R. Co.* v. *Vt. C. R. Co.*, 34 Vt. 1. It is only when the terms of the contract are ambiguous that this rule of construction is resorted to, and then the intention of the parties must be determined from the words of the

contract, but a reference to the situation of the parties and the subject matter, under the circumstances, is always proper.

In the mortgage under which the defendant claims, there is no reference, in the description, in express terms, to that portion of the water power created for the purpose of being stored and used by the parties owning the middle and lower privileges. The description is by reference to former deeds and adding thereto " together with the various shops, mills, dwelling houses and other buildings thereon standing and the steam engine, boiler and appurtenances thereto belonging, and the main shafting in said buildings, and all the water power, meaning to convey, etc." We think this description covers the water power which belongs and is appurtenant to the other property conveyed and not all the water power created by the great dam.

There is no description of the great dam, nor the water power created by it, and no reference to it, and when we take into consideration the circumstances connected with the great dam and the middle power, we think it is apparent that the parties intended to convey only the water power connected with the buildings at the upper dam, without infringing upon any of the rights which the middle and lower powers had under the by-laws of the corporation to which all of the conveyances theretofore were subject.

At the time of the execution of the mortgage under which the defendant claims, the buildings erected at the middle power were of great value. The property at one time was mortgaged for twenty-five thousand dollars, and at another for thirty-five thousand dollars; one building was erected which, with the engine house and chimney cost thirty thousand dollars, and there was also erected a brick forge shop, brass foundry, car shop, blacksmith shop, machine shop, engine house and chimney, and a large boarding house, and the upper power was then utilized as hereinbefore stated.

The master finds that the right to draw water from the great dam was a large element in the value of the lower privileges and the property connected therewith. Such was the situation at the middle and upper powers when the Manufacturing Company executed the two mortgages; the one upon the upper privilege for ten thousand dollars and upon the middle for twenty thousand dollars.

Considering the phraseology of the mortgage, the character, situation, condition and values of the properties, the then use of the water; and the amount for which each privilege was respectively mortgaged, we are inclined to construe the description in the mortgage under which the defendant claims as covering only the water power used in connection with the buildings at the upper privilege and to which it was entitled under the by-laws by which, until that time, all the parties had been governed. It could not have been the intention of the parties to pass all the water power created by the great dam and reservoir under the mortgage of the upper power and thus incur the risk of destroying, to a great extent, the values of the middle privileges. The defendant took possession of the upper power in December, 1884, and during the following year made repairs upon the great dam, and claimed that the middle and lower powers were chargeable with one half of the amount paid for such repairs upon the basis of the values of the three respective powers which he claimed to be as follows : The upper power five-tenths, the middle power three-tenths, and the lower power two-tenths, and the owners of the middle and lower powers paid the respective amounts in accordance with the defendant's claim. This act of the defendant as late as the year 1885 indicated the practical construction that he put upon the deed under which he claims title, for it was only by force of the by-laws that he could call upon the lower powers to contribute to the repairs of the great dam. Upon the construction of the deed in question the remarks of Ben-

nett, J., in *Thompson* v. *Prouty*, 27 Vt. 14, are quite apropos.   In speaking of whether a contract should have a certain construction, he says :

"I, for one, should have some doubts,   *   *   *   *   * but the defendant having given a different practical construction to it, we are disposed to adopt his in that particular."

It is true, the use of the water has been to some extent irregular, but except temporarily it has not been adverse to the rights of others, and did not have the effect, as matter of law, to abrogate the by-laws ; neither did the merger of the easements, by the acquisition of the title to all the properties by E. G. Lamson, and the master finds that unless thus abrogated there has been no abandonment of them. No rights have been acquired by the defendant by prescription or adverse use.   This is apparent from the facts reported.   Even if it were otherwise he could not in this proceeding insist upon such rights, for he does not claim them by the answer.   *Warren* v. *Warren*, 30 Vt. 530.   With the construction which we put upon the deed under which the defendant claims, the ownership of the land under the great dam, and under the water in the pond, etc., is immaterial, as is also the ownership of stock in the Ascutney Mill Dam Company.   It is therefore unnecessary to consider the various exceptions to the rulings of the master, and to the report, in respect to those questions.

There is no personal liability, on the part of the defendant, to the orators.   *Lamson* v. *Worcester*, 58 Vt. 381.

The orators are entitled to a decree in accordance with the prayer of the bill, excluding any personal liability of the defendant.

*Decree reversed and cause remanded with mandate in accordance with the views herein expressed.*