# FREDERICK J. LOWREY, GEORGE P. CASTLE AND WILLIAM O. SMITH, TRUSTEES, v. THE TERRITORY OF HAWAII.

### ORIGINAL.

**ARGUED DECEMBER 18, 1905. DECIDED JANUARY 3, 1906.**

### FREAR, C.J., HARTWELL AND WILDER, JJ.

TERRITORY—*action against for its breach of agreement made in 1849, between the Hawaiian government and American Board.*

This court has jurisdiction of an action of assumpsit by the successors of the American Board of Foreign Missions brought upon a breach by the Territory of an agreement made between the board and the Hawaiian government in 1849.

ID.—*agreement—construction of—new term not added by acts of parties.*

A transfer was made by the American Board to the Hawaiian government of the Lahainaluna school property on condition that "the said institution shall be continued at its expense as an institution for the cultivation of sound literature and solid science, and further that it shall not teach or allow to be taught any religious tenet or doctrine contrary to those heretofore inculcated by

the mission," etc., and that in case of nonfulfilment of the condition the sum of $15,000 should be paid. From the date of the transaction until 1903, religious instruction continued to be taught at the school as previously, both parties appearing to regard such instruction as required by their agreement. Held: the express agreement does not require that the specified instruction should be given, and the terms of the agreement being clear and unambiguous the practical construction which the parties have made does not introduce a new term in the agreement.

The school was changed by the Territory to a technical school under the name of the "Lahainaluna Agricultural School." Held: this is not a breach of the agreement to continue the institution for the cultivation of sound literature and solid science.

OPINION OF THE COURT BY HARTWELL, J.

The plaintiffs claim of the defendant the sum of $15,000 for its breach of agreement under the following circumstances:

In 1849, the Hawaiian government, at the suggestion of the American Board of Commissioners for Foregn Missions, took the Lahainaluna school property on the Island of Maui, which consisted of a claim of the board, then withdrawn, for a Land Commission Award for the land used by the school and the school buildings, library and philosophical and other apparatus whch were burned in 1862 and replaced by the government. A letter of April 25, 1849, from W. P. Alexander, C. B. Andrews and S. N. Castle, a committee of the Hawaiian Mission representing the board, to Richard Armstrong, Minister of Public Instruction, expressed the condition on which the transfer was made to be as follows: "That the said institution *shall be continued* at its expense as an institution for the cultivation of sound literature and solid science, and further that it shall not teach or allow to be taught any religious tenet or doctrine contrary to those heretofore inculcated by the mission which we represent, a summary of which will be found in the confession of faith herewith enclosed." A further proviso was expressed in the letter that "in case of nonfulfillment or violation of the conditions" the property should revert to the mission, or, as modi-

fied by the government, it might at its option pay the sum of $15,000, and if it should divert the establishment to other purposes than those of education it would "sustain an institution of like character and on similar principles in some other place on the islands, or pay the sum of $15,000."

The plaintiffs contend that the expressed agreement meant not only that the government should not teach nor allow the teaching of any religious doctrines contrary to the specified confession of faith, but that it should require those doctrines to be taught. This contention is based upon the facts averred in the petition that the American Board in 1835 obtained the Lahainaluna premises from the Hawaiian chiefs for a school, the purpose of which was to introduce and perpetuate the Christian religion and to educate young men to become assistant teachers of relgion, meaning that they should be educated in accordance with the tenets of the Calvinistic creed which then prevailed at the Andover Theological Seminary; that the school was established in 1831 and until 1849 carried on by the board in strict accordance with its purposes as above expressed, all of which was perfectly understood and appreciated by Richard Armstrong, to whom the letter of the committee was addressed, and by the other members of the Hawaiian government; that from the time of taking the school in 1849 until 1903 the Hawaiian government caused religious instruction to be given at the school as it formerly had been given, thereby showing its understanding that the agreement required this to be done. This understanding on the part of the government was further shown by a letter of October 29, 1864, of Attorney General C. C. Harris to the board of education advising that only those sects could control the school which taught the doctrines of each and all the articles of the confession of faith and if the government was not willing to keep the conditions the property and improvements must be restored to the American Board; that the following year the board of education declared that "a full compliance with the agreement consists in appointment of persons teaching in the doctrine and after the manner of the Con-

gregational and Presbyterian churches of the United States, and if the board do not see fit to carry on the institution they must reconvey it or pay the sum of $15,000."

It is alleged that religious instruction at the school ceased in September, 1903, when the Territory made the school a technical school named the Lahainaluna Agricultural School. The cessation of religious instruction and of instruction in sound literature and solid science other than is implied in the teaching required at a technical and agricultural school is alleged to be a breach of the original agreement.

The plaintiffs contend that a practical construction has been placed upon the agreement by both parties, which is binding upon the defendant, conforming, as it does, to the objects for which the school was primarily established.

It is too late, they say, after both sides for over fifty years have acted upon the agreement as one which required that the government continue the previous course of religious instruction at the school, for the Territory now to restrict the meaning of the agreement to its precise language.

That the unwritten term above mentioned was by the parties themselves read into and made part of the agreement has been urged in the plaintiffs' argument and in their brief with great earnestness and evidently with profound conviction of its truth. In support of their contention they cite numerous decisions and extracts from text writers, including Lord Chancellor Sugden's remark, "Tell me what you have done under a deed and I will tell you what that deed means," which remark, it is said, "has come to be accepted as a maxim in the construction of contracts." *Chicago Ry. Co. v. N. P. Ry Co.,* 101 Fed. 792. This was a case in which the court held that a contract between two railways, requiring one of them to keep and maintain in good order property in their joint use, included the expense incurred for flagmen, station agents, switch tenders and other employees whose services were necessary to the safe and orderly operation of trains running over the joint tracks, and especially as the expense had for ten years been paid by the company on monthly

itemized statements, showing how both companies understood the contract and there being "no inconsistency between the terms of the contract and the practice of the parties under it." We have not access to the report of the case in which the Sugden remark is said to have been made, *Drummond v. Atty Gen.,* 3 Dr. & W. 165. It appears from the report of the case on appeal, 2 Ho. Lords Cas. 186, that the court was required to say whether the expression "protestant dissenters," used in a deed of trust, included unitarians who had for a long time been treated by the trustees as within the meaning of the trust deed. Much evidence was received consisting in great part of historical documents, extracts from sermons and theological and controversial works published by the trustees, ministers of Dublin congregations, both prior to and after the foundation of the charity. There was further evidence "that the founders and original trustees and their successors for a long time were not merely trinitarian protestant dissenters, but that they had in various ways manifested the utmost abhorrence of unitarians and their doctrine." Lord Chancellor Sugden decreed that unitarians were not entitled to participate in the trust funds and that those of them who were trustees should be removed and others, trinitarians, appointed in their places. The decree was affirmed on appeal, the court saying, "It is clear that the words of themselves have not any such known legal meaning as the appellants would attach to them." Neither of these cases would authorize the admission of evidence to explain the meaning of words having an established, clear and unambiguous meaning. It is only with reference to ambiguous, uncertain or incomplete terms in a contract that the citations in the plaintiffs' brief apply, namely, that "a construction of a contract adopted and acted upon by both parties will be regarded as worked into the contract." 1 Wharton, Contracts, Sec. 206.

"In cases where the language used by the parties to the contract is indefinite and ambiguous, and hence of doubtful construction, the practical interpretation of the parties themselves

is entitled to great, if not controlling influence." *Topliff v. Topliff*, 122 U. S. 121.

"Where the language used by the parties to a contract is of doubtful construction, the practical interpretation by the parties themselves is entitled to great if not controlling influence." *Chicago v. Sheldon*, 9 Wall. 50.

"The great object and only foundation of all rules of construction is to come at the intention of the parties, and if the words or terms are equivocal, resort may always be had to the circumstances under which the contract was executed, contemporaneous constructions of the parties, as evidenced by their acts, and any subsequent acts showing how the parties understood their contract and what practical construction they put upon it." *White v. Amsden,* 67 Vt. 1.

"If the parties have used words which have an ordinary meaning free from ambiguity, and no technical meaning is shown, extrinsic evidence is inadmissible to show that the parties used such terms in a sense different from their ordinary meaning, as the only effect of such evidence would be to contradict the legal effect of the language which the parties themselves have used." 2 Page, Contracts, Sec. 1111.

"If a contract is ambiguous in meaning, the practical construction put upon it by the parties thereto is of great weight." Ib. Sec. 1126.

"Under cover of construction a court cannot reform a written contract to make it express the real intention of the parties, which by mistake is not expressed in the words thereof." Ib. Sec. 1130.

Thus it appears from many of the plaintiffs' citations that the rule of construction of contracts is not as broad as they claim.

The terms of agreement are not of doubtful import,—they are as clear as language can express. Why it was that no condition was made which required the government to give religious instruction, why the representatives of the board thought that this condition would be observed although not expressed, and why it appears to have been regarded by the government as an implied condition, becomes evident, we think, upon reflection. No man of New England birth and training was unfamiliar with the general custom prevailing in the public schools of giv-

ing at least the amount of religious instruction included in morning prayers and in scriptural readings; no one familiar with this custom as were most, if not all, of the missionaries in Hawaii, would for a moment have doubted that some sort of religious instruction would continue indefinitely to be taught at the Lahainaluna school as well as all other schools. In the thought of the American Board and of the Hawaiian Mission as well it was requisite merely to restrict such instruction to the inculcation of those doctrines in which they believed. Those officers of the Hawaian government, who, like attorney general Harris, were members of the Protestant Episcopal Church, were perfectly aware of the distinctive theological tenets of their own church and of other evangelical churches of America and knew that the teaching at Lahainaluna of their own church doctrines would be to repudiate the agreement with the American Board and would result in a forfeiture of the property transferred to the government by the board unless the sum of $15,000 should be paid in accordance with the agreement; they did not, on their part, contemplate that which has come to pass, namely, that the school might receive no religious instruction upon any theological basis. One may regret that wise and devout Christian men in America, whose practical Christianity was sufficient to enable them in their several ways to accomplish so much for the uplifting of humanity, have found themselves unable to agree upon some form of religious instruction in the schools, but thus far this has not come about.

Whatever the reasons which influenced the Hawaiian government in treating the agreement as it did, its officers had no power to add to or subtract from its clearly expressed terms, nor did they by carefully avoiding the teaching of any doctrines, other than those mentioned in the agreement, thereby admit any obligation of the government to teach any doctrines.

As for the American Board, whether by oversight, or because they thought it unnecessary, or that it was unwise in view of the possibility of exciting antagonism in the legislature or in the cabinet of the King, they did not incorporate in the agreement

the requirement which the plaintiffs say was intended to be agreed upon. This court has no right to take the agreement as meaning anything else than it clearly expresses.

We have preferred, before stating and discussing the defendant's demurrer to the petition, to consider what the agreement was to which the demurrer applied. It follows from holding that there was no agreement for affirmative religious teaching but merely that no heterodox instruction should be allowed, that no breach of agreement resulted from ceasing to teach the prescribed doctrines. This amounts to sustaining the ground in the defendant's demurrer which claims that the petition sets forth upon that subject no cause of action. The grounds of the demurrer in substance are (1) that this court has no jurisdiction of the claim for damages; (2) that the United States, to whom the land has been ceded upon which the school is established, ought to be made codefendant; (3) that no cause of action is stated, it appearing (a) that the agreement was subject to ratification by the legislature and the act of July 11, 1850, relating to the Lahainaluna seminary failing to set forth the terms on which the arrangement was made but merely that one had been made "whereby the seminary of Lahainaluna has been ceded to the King's government on condition that the government undertakes its support," (b) that the right of action, if any, accrued upon the annexation in 1898, more than two years prior to the commencement of this action, (c) that no breach of any condition is shown, and (d) that if the conditions of the agreement were broken this was done in consequence of laws rendering the performance of them impossible; (4) that the petition pleads conclusions of law in its assignment of breach of conditions, not setting forth in what respect the conditions were broken.

The first, second and fourth grounds and divisions a, and b, of the third ground of the demurrer are not sustained.

The question of the impossibility of the performance of the agreement presented by the demurrer relates to the provision in section 55 of the Organic Act, "nor shall any public money be

appropriated for the support or benefit of any sectarian, denominational or private school, or any school not under the exclusive control of the government," being in effect the same as the requirement of article 97 of the constitution of 1894, prohibiting public aid to sectarian or private schools. As we have held that there was no agreement to teach certain religious doctrines, the question does not arise of the effect of subsequent legislation and, in view of its importance, ought not to be passed upon obiter.

This leaves the question whether the agreement to teach sound literature and solid science was broken by failure to teach those branches of learning otherwise than they would require to be taught in a technical school and school of agriculture. The averment in the petition of the fact that the "cultivation of sound literature and solid science has also ceased" would raise an issue of fact to be tried on evidence were it not modified, and necessarily controlled, by the additional averment that "the institution has become a technical school under the name of the Lahainaluna Agricultural School." By the rule that at common law pleadings are construed, as far as they reasonably may be, against the pleader, the additional averment must be taken to be an admission that the usual technical training is now given at the school in the science of agriculture, so that it becomes a question of law whether such training eliminates, as contended by the plaintiffs, or, on the other hand, includes instruction in sound literature and solid science. An agreement to teach solid science is not violated, but is observed, by teaching applied science relating to agriculture. The science of agriculture cannot be taught without imparting at the same time instruction in the literature relating to the science. We are not prepared to say that such literature, so taught, is not as sound or as valuable as are literary studies undertaken by themselves, or that the agreement is broken by teaching solely that literature which is limited by the study of science.

The plaintiffs say that an agricultural school, although scientific in character, "is a school primarily intended to the training

of its students in the adaptation of certain selected branches of knowledge to a handicraft or industry; while incidentally the school probably does lead to the inculcation of some learning and knowledge, it would be knowledge or learning of a special character, the accomplishment of which in itself is not the purpose of the school. The purpose of the school is rather intended for the training of men for an occupation. This negatives the idea that it is an institution for the cultivation of solid science."

Cases are cited which discuss the meaning of literary and scientific institutions, technical schools and schools generally with reference to exemption of property from taxation, but this case does not demand strict construction of a statute which exempts property from taxation. In considering the meaning of the agreement we derive no assistance from definitions of "literature" and "science" or from considering the various purposes of acquiring knowledge for general use or for use in specific work.

The literature taught in American schools fifty years ago did not include the literary courses of the present day; little more was taught which hinted at literature than reading, grammar and composition, the object being to acquire a habit of using the English, and at Lahainaluna the Hawaiian, language correctly. A technical school may or may not, according to its grade, require these studies, but a correct and intelligent use of language is as likely to be acquired in connection with technical studies as when made a separate subject of study. Probably Lahainaluna pupils obtained more proficiency in the use of language by their practical work in printing, which for many years was extensively carried on there, than by theoretical studies.

In no way of looking at the subject which commends itself to our judgment do we regard the agreement as violated by making this a technical school of agriculture.

The demurrer is sustained.

*D. L. Withington* and *C. H. Olson, Castle & Withington* and *Smith & Lewis* on the brief, for plaintiffs.

*M. F. Prosser, Deputy Attorney General,* for the Territory.