Jackson Milling Co. vs. Chandos and others.

CASSODAY and PINNEY, JJ., took no part.

JACKSON MILLING COMPANY, Appellant, vs. CHANDOS, Administrator, and others, Respondents.

JACKSON MILLING COMPANY, Respondent; vs. CHANDOS, Administrator, and others, Appellants.

*December 23, 1891 — June 15, 1892.*

*Water-power: Construction of deed: "Inches of water:" Evidence.*

1. The question being as to the meaning of the term "inches of water" in a deed granting the right to draw from a canal "2,000 inches of water under an eleven-foot head," it is *held*, upon the evidence, that that term had not acquired a fixed technical meaning, and that therefore the grant must be construed in the light of the attendant circumstances.

2. A previous contract, in fulfilment of which the deed was given, was admissible in evidence to aid in construing the deed.

3. By the contract in fulfilment of which the deed was given the grantors were to convey sufficient water to run a mill of a certain capacity, and the grantee was to pay one fourth the cost of enlarging the race and building and maintaining dams, etc., so as to obtain sufficient water for his said mill and also for a mill being erected by the grantors; and when the deed was given the grantee executed a bond to pay one fourth of such cost. The grantors' mill was of a capacity to draw at least twice as much water as that of the grantee. To utilize his 2,000 inches of water, the grantee constructed a flume with openings for the passage of water aggregating in superficial area 1,980 square inches, and these openings remained

unchanged for many years. If the term "inch of water" were construed to mean a stream having a cross-section area at right angles with its flow of one square inch and moving with a velocity due to the given head, the 2,000 inches would practically take the entire supply of water in the canal; but the water which would be discharged through a simple aperture of 2,000 square inches would be but sixty-two per cent. of that amount. *Held*, that it was the manifest intention of the parties that the water granted should be measured by the superficial area of the openings, and that the term "2,000 inches of water" must be construed to mean the amount which would be discharged through a simple orifice of 2,000 square inches area in the side of a flume.

4. Upon the evidence in this case, it is further *held* that the retardation of flow caused by the machinery in the grantee's mill was not intended by the parties to be an element in determining or measuring the quantity of water granted by the deed.

APPEALS from the Circuit Court for *Fond du Lac* County.

This action was originally brought against Marian L. Bensley to perpetually enjoin her from drawing down the head of water in a certain canal described in the complaint below eleven feet, and to have plaintiff's right to draw 2,000 inches of water under an eleven-foot head from such canal adjudged superior to the right of defendant to draw any water therefrom. Marian L. Bensley having died before judgment, the action was revived against her administrator and heirs at law.

The water-power in controversy is situated on the west bank of the Wisconsin river, at Centralia, in Wood county, and is formed by a series of islands and dams in said river, and an artificial canal more than eighty rods in length, by means of which a part of the water of the river is turned into said canal, and used by both parties for hydraulic purposes of their respective mills. No other parties are interested as owners in such water-power, except the plaintiff and the defendant. Plaintiff's mill is a flouring mill, located on the canal above the pulp mill of defendant, which last-named mill is at the lower end or foot of the canal.

October 5, 1860, Orestes Garrison was in possession and owned the equity of redemption of the entire water-power, and a large amount of land connected therewith; and Ira Harris held the legal title thereto as security for payment of money loaned. At that time the canal in question was partially constructed. On said October 5, 1860, Harris, with the consent of Garrison, executed to one George Weller a warranty deed conveying certain lands adjacent to the canal, also the right to draw from said canal 2,000 inches of water under an eleven-foot head, together with a right of way below the mill for the purpose of a tailrace. March 3, 1868, Garrison and wife executed to Weller a quitclaim deed of the same premises and water-power. Prior to the execution of the deed of October 5, 1860, Weller had constructed a flouring mill on the premises so deeded to him, and soon after the delivery of said deed he commenced to use water from the canal for the purpose of operating his mill, and continued so to use water until the year 1874, when he sold the premises and power to Alvin S. Trow and Sidney B. Coleman, using the same description as to the water-power contained in the deeds from Garrison and Harris to him. The plaintiff, through several mesne conveyances, has succeeded to the rights and interest of Weller in said premises and water-power, and is the owner thereof in fee simple. Marian L. Bensley, through several mesne conveyances, succeeded to the right, title, and interest which Garrison and Harris had in the balance of said land, canal, and water-power, the first of such conveyances being the deed from Garrison and wife to John Bensley, March 22, 1870, in which deed, and in the succeeding deeds, the land, water-power, and the privileges conveyed to Weller were expressly excepted in the language of the deed from Harris to Weller.

The plaintiff charges that the defendant, by excessive use of water at her pulp mill, has drawn down the head of

water at the plaintiff's flouring mill to a head of nine feet, so that the plaintiff was obliged to shut down its mill, and that defendant threatens to continue such excessive use of water. The plaintiff also charges that plaintiff's right to draw 2,000 inches of water under an eleven-foot head is paramount and superior to the right of defendant to draw any water, and that the words "2,000 inches of water under an eleven-foot head" mean a stream of water having a cross-section area at right angles to the thread of its flow of 2,000 square inches, and moving with the velocity due to a head of eleven feet; that is, a velocity of 26.60 feet per second.

The answer of defendant denies that this is the correct meaning of the term, and alleges that it means so much water as would be discharged from an ordinary flume through an opening cut in the side thereof of the area of 2,000 inches, while said water is retarded by the actual operation of wheels in motion doing ordinary work as water wheels running a mill, and which would be, under an eleven-foot head, a flow of about 5,000 cubic feet of water per minute or about 104 horse power, theoretical.

As a counterclaim the defendant alleges that the deed from Harris to Weller was executed in fulfilment of a previous contract made between Garrison and Weller in July, 1860. This contract provided for the conveyance to Weller of a certain piece of land, being part of the land afterwards conveyed, and also the right to draw from the race sufficient water, properly applied, to run four run of millstones, or water sufficient to drive the necessary machinery for a gristmill of the capacity of four run of stones; that it was the intention of the parties, in making the deed from Harris to Weller, simply to execute and fulfil this contract, and to give Weller a small piece of land in addition thereto, and that all the persons through whom the plaintiff derives title had notice when they bought said property of the ex-

istence and contents of such contract; and that the deed from Harris to Weller was made to fulfil the same, and on no other condition. It is also alleged that the amount of water necessary to fulfil the grant agreed to be made in the contract was about 4,000 cubic feet per minute, and that the description of water by number of inches under a given head is very indefinite, uncertain, and not practically useful.

The plaintiff, in its reply, denies all knowledge of the contract set forth in the answer, and alleges that it purchased the premises and water-power in good faith and for a full and fair consideration. The plaintiff also pleaded in bar to the counterclaim the decree of the circuit court of the United States for the western district of Wisconsin, rendered in an action in equity wherein Marian L. Bensley was complainant, and Coleman, Jackson, and Witter, plaintiff's grantors, were defendants, which action was brought to reform the deed from Harris to Weller by striking out the words, "2,000 inches of water under an eleven-foot head," and inserting the words, "water sufficient to furnish eighty horse power, theoretical;" which decree denied any relief in the way of reforming said deed, and provided that it should be without prejudice to any subsequent suit for the interpretation of said deed as to the amount of water which the defendant acquired the right to use thereunder.

After a somewhat lengthy trial, the circuit court, among other findings of fact, found that the expression "inches of water," in the deed from Harris to Weller, at the time of making said deed was not an expression so definite and certain and of so well-established a meaning that the same may not be interpreted in view of the actual meaning of the parties; that when Weller completed his flouring mill he built a flume from said canal, and inserted three spouts therein leading to three wheels, and constructed openings for the insertion of two other spouts of the same size to

lead to two other wheels; that the three spouts so inserted and leading to the wheels were each twenty-two inches by eighteen inches, gateage measurement; that the mill, canal, and flume remained in the same condition until 1874–75, at which time the same was the property of one Trow and Coleman and one G. J. Jackson.

The court further found that the deed from Harris to Weller conveyed a solid vein of water having a cross-section area of 2,000 inches vertical, at right angles with the thread of the current, and that such vein of water was a vein moving with the velocity due to the head as retarded by such machinery in actual operation as was then in use, and that such retardation was fifty per cent., the conclusion of the court being that the true meaning and intent of the grant was a grant of a vein of water 2,000 inches in cross-section area, moving with the velocity due the head as retarded by machinery, and amounting to 11,083 cubic feet of water per minute under a head of eleven feet.

The court further found that the defendant had drawn down the water in the canal at times below eleven feet, and intended and threatened to do so in the future, to the injury of plaintiff's rights; that the plaintiff and its grantors, Coleman, Trow, Jackson, and Witter, were each and all purchasers of the premises and water-power in good faith, for a full and fair consideration, and without notice of the contract set up in defendant's answer; and that the acts of the defendant in drawing down the head of water below eleven feet were unlawful, and that the plaintiff is entitled to recover damages therefor, to be assessed. The court further found that the plaintiff was entitled to an injunction restraining the defendant from drawing down the water below, so as to interfere with or prevent the use by plaintiff of 11,083 cubic feet of water per minute under an eleven-foot head.

Judgment was entered on said finding. Both parties

filed numerous exceptions thereto, and both parties appealed from the judgment. Plaintiff appeals from all that part of said judgment which fixes and limits its right to draw water from said canal at and to 11,083 cubic feet of water per minute under an eleven-foot head at its said mill for hydraulic purposes, and which limits its right to an injunction to that extent only, and from that part thereof denying the plaintiff the right to draw from said canal at its said mill, under eleven feet head, 22,166 cubic feet of water per minute for hydraulic purposes, and denying an injunction restraining the defendants accordingly. Defendants appeal from that part of said judgment which fixes the right of plaintiff to draw from said canal at 11,083 cubic feet of water per minute under eleven feet head at its said mill for hydraulic purposes, and which grants to plaintiff an injunction restraining the defendants accordingly.

For the plaintiff there were briefs by *Gardner & Gaynor*, attorneys, and *S. U. Pinney*, of counsel, and oral argument by *S. U. Pinney* and *Geo. R. Gardner*.

For the defendants there was a brief by *Hooper & Hooper*, and oral argument by *Moses Hooper*. As to the meaning of the term "inch of water," they cited *Blanchard v. Doering*, 21 Wis. 477; *S. C.* 23 id. 200; *Schuylkill Nav. Co. v. Moore*, 2 Whart. (Pa.), 477, 492; *Canal Co. v. Hill*, 82 U. S. 94; *Norris v. Showerman*, 2 Doug. (Mich.), 16, 25, 26; *Samuels v. Blanchard*, 25 Wis. 329, 332, 338; *Iszard v. May's Landing W. P. Co.* 31 N. J. Eq. 511, 516; *Society for E. M. v. Holsman*, 5 id. 126.

WINSLOW, J. The plaintiff corporation owns the paramount right to draw from the canal in question 2,000 inches of water under an eleven-foot head. The defendants own the canal and water-power subject to the plaintiff's right to use its 2,000 inches of water at the head named, and the main question in controversy is as to the meaning of the

term "2,000 inches of water," as used in the deeds under which plaintiff claims.

It will be seen that the question at issue is substantially the same as one of the questions involved in the case of *Janesville Cotton Mills v. Ford, ante,* p. 416, the only difference in the language of the grants being that in the *Janesville Case* the words used were "square inches of water," while in the present cases the words were simply "inches of water." The difference is not important, because it was practically conceded by counsel on both sides in the present case that the term "inches" must be construed as "square inches," because it is plain that "lineal" inches would be utterly insensible. The plaintiff's contention here is the same as the contention of defendants in the *Janesville Case,* namely, that the term "inch of water" had at the time of the grants in this case a definite and fixed meaning among mill-men and hydraulic engineers, to wit, "a stream of water having a cross-section area at right angles with its flow of one square inch, and moving with a velocity due to the given head." This is what we have called in the *Janesville Case* the "theoretical inch." It appears that the theoretical velocity due to a head of eleven feet is 26.60 feet per second, and that a stream of 2,000 theoretical square inches at that head delivers 22,166 cubic feet of water per minute.

On the other hand, the defendants claim that there was no such fixed technical meaning to the term at the time the grants were made, and that the term "inch of water" must be construed as the facts and circumstances show that the parties understood and meant at the time; and defendants contend that such facts and circumstances clearly show that the parties meant by the term "inch of water" so much water "as would be discharged from an ordinary flume through an opening one inch square, cut in the side thereof, without adjutage, under an eleven-foot head, while

said water is retarded by the actual operation of wheels in motion doing ordinary work as water wheels running a mill." Under this definition defendants claim that the plaintiff's grant of 2,000 inches means a flow of about 5,000 cubic feet of water per minute. This is what we have called in the *Janesville Case* the "practical square inch," with an additional element, namely, the retardation of the flow caused by the propulsion of the wheels and machinery of a mill doing ordinary work. Without this element, the practical inch amounts (as stated in the *Janesville Case*) to about sixty-two per cent. of the theoretical inch. The defendants claim that the retardation caused by such wheels as were in use at the time of the first grant in this case amounted to more than fifty per cent., and thus arrives at the conclusion that plaintiff is only entitled to a flow of about 5,000 cubic feet per minute.

The circuit court adopted neither view in its entirety, but found that the original deed of 2,000 inches of water, under which plaintiff claims, conveyed "a solid vein of water, having a cross-section area of 2,000 inches at right angles with the thread of the current, flowing with a velocity due to the head of eleven feet, as retarded by machinery in actual operation, and such machinery as was in use at the time of making," and that such retardation was fifty per cent. This conclusion gave the plaintiff a stream delivering 11,083 cubic feet of water per minute, being just one half what plaintiff claims, and a little more than double what the defendants claim that plaintiff is entitled to.

It will be seen that the difference between the plaintiff's rights if the grant be construed according to the contention of the plaintiff, and its rights if the same grant be construed according to the contention of the defendants, is very considerable, and of the greatest importance in this case, because the total capacity of the canal at the time the first grant was made in 1860 was not more than 25,000 cubic

feet per minute when the water flowed at its proper veloc-
ity.    It is certain that the term "inch of water" does not,
in the ordinary and usual sense of the words used, convey
to the mind any idea of volume.    We say now, as we said
in the *Janesville Case*, that if the term had a fixed and defi-
nite meaning among hydraulic engineers and mill-men at
the time it was used, such meaning would prevail, notwith-
standing the fact that people ordinarily did not know of
such meaning, or even that the parties to the deeds them-
selves did not know of it.    Parties cannot use technical
terms with a fixed meaning, and then disclaim such mean-
ing; but when such alleged technical meaning is an arbi-
trary one, and not one which the word or words would
naturally import, it must clearly appear that the acquired
or technical meaning was not the subject of substantial dis-
pute or doubt; that it was well settled and understood, at
least among the members of the profession or trade which
is supposed to use the term in such technical sense.

There is a greater volume of evidence in this case upon
the subject of the alleged technical or fixed meaning of the
term "inch of water" than there was in the *Janesville
Case*, and we have carefully considered it, but the conclu-
sion which we have reached is the same as that reached in
the *Janesville Case*.    That conclusion is that the term "inch
of water" had not acquired in 1860, nor even at the time
of the latest grant in this case, any fixed, certain, and tech-
nical meaning.    The plaintiff's own evidence forces this
conviction upon our minds, and we shall briefly here refer
to some of that evidence from which we draw this conclu-
sion.

The plaintiff called, as an expert, one J. B. Francis, of
Lowell, Mass., who was admitted by both sides to be an
expert hydraulic engineer of great experience and of the
highest standing.    Mr. Francis was examined at length
upon the subject of the meaning of the term "inch of

water," and, among other things, he said: " The term has a technical meaning among water-wheel makers and venders, as I gather from their publications, at least a great many of them that I have examined, and with them it means what engineers know or understand as the theoretical discharge of an orifice of 2,000 square inches under eleven feet head. It is a mode of measuring not in use generally in the larger water-powers of New England, and without being explained by a technical meaning I believe it would have no signification."      Again he says, referring to the alleged technical definition of an " inch of water," " I don't look upon it as a scientific definition of water at all, but it is something that has grown up among the wheel builders and makers to indicate the power of their wheels, but I don't think it is generally known in the scientific world.   I presume a great many engineers have picked it up as I have. Take the world through among scientific men, I think they could give it no signification."

Edward Ruger, an hydraulic engineer of considerable experience, was also called as a witness by the plaintiff, and in reply to the question, " Don't all men who are educated in hydraulics understand it [an inch of water] practically means the same thing? " he answered: " I don't know as they do.   I should say that some would probably think it meant what would pass through an inch hole, and some not."

It further appeared from the evidence that at a convention of engineers held a few years since at Minneapolis, where about 150 engineers were present, the question as to what constituted an " inch of water " was discussed, without any definite conclusion being reached; some claiming one meaning and some another.   It was further shown, by the evidence of practical mill-men interested in water-powers from an early day at Menasha, Neenah, and Appleton, that the alleged technical meaning had never been

known in that vicinity, and there is absolutely nothing in the case to show that either the original grantors or the original grantees of the powers in question knew or had any idea of such a definition of the term "inch of water."

While on this subject, it is instructive to note that the last edition of Webster's International Dictionary, published in 1892, defines an "inch of water" as follows: "A unit of measure of quantity of water, being the quantity which will flow through an orifice one inch square, or a circular orifice one inch in diameter, in a vertical surface, under a stated constant head."

Plaintiff relied much upon the rules and definitions stated in certain books, most of which were advertisements of turbine water-wheel makers, issued within the past ten or fifteen years. One book, which was much relied upon by the plaintiff, is entitled "The Miller, Millwright, and Mill Furnisher," by Robert Grimshaw, published at New York in 1882. This book, indeed, gives the definition of a "square inch of water" in accordance with the plaintiff's contention, that is, the theoretical inch, but in connection therewith there is also the following very significant statement: "Correspondence indicates a frequent misapprehension of the meaning of the term 'square inches of water vented.' Some think that, in a wheel said to use 100 square inches of water, it is meant that the entire area of the chute apertures measures 100 square inches, but others think the meaning to be that the entire area of the discharge apertures is 100 square inches. Neither of these views is correct." The author then proceeds to give the definition of a theoretical square inch of water. This shows, as we think, very conclusively that even in 1882 there was not a certain, definite, technical meaning attached to the words "square inch of water." Two of the wheel books so introduced by the plaintiff contain substantially the same statements as given by Mr. Grimshaw. The Victor Turbine Wheel Book, pub-

Jackson Milling Co. vs. Chandos and others.

lished in 1887, states: " Our correspondence indicates a fre-
quent misapprehension of the meaning of the term 'square
inches of water.'"   The Stevenson Turbine Wheel Book,
published in 1869, contains the following similar statement
with regard to the term "inches of water:" "This term has
been the innocent cause of much misunderstanding between
the manufacturers and purchasers of turbine water wheels.
Some parties consider it the area of inlet to the wheel, and
some think it to be the area of the discharge openings of
the wheel, and some think it is the area of a body of water
passing over a weir; but all of these are erroneous."

We shall spend no further time citing from the testi-
mony, but shall simply say that the conclusion seems irre-
sistible to our minds that the term "inch of water" has
not acquired any fixed technical meaning which must con-
trol when used in a grant, although the testimony shows
that the tendency among wheel venders and mill-men for
some years has been and is to attach to it the meaning of
the theoretical inch; but it does not appear that such theo-
retical arbitrary meaning has yet crystallized so as to be
controlling, like the meaning of the term "foot of lumber"
or other arbitrary terms which are known and recognized
without dispute.

As we have before said, the term "inch of water" ex-
presses no idea of volume to the common mind; neither the
lineal inch nor superficial inch imports volume; but we know
that the parties who used the expression in these deeds had
some definite purpose in view; we know that they attached
some meaning to the words they used; and it is the duty
of the court to find out, in view of the fact that various and
different meanings may be given to it, what the meaning
attached to it by the parties in fact was.   In prosecuting
this inquiry it becomes necessary, under familiar principles,
to consider the circumstances surrounding the parties at
the time the original grant was made.   It was said in the

*Janesville Case:* "Doubtless the circumstances surrounding the parties at the time the grants were made, the condition of the race, the size of the apertures through which water was drawn, the capacities of the wheels, and many other facts tending to throw light on the apparent intention of the parties at or about the time the deeds were made, should be considered upon the question. *Ganson v. Madigan*, 15 Wis. 144." We shall therefore proceed to notice some of the prominent facts which surrounded the original grant of water, and which must, we think, be considered in determining the meaning of the term "inch of water" in this case.

The water-power in question is formed by a series of islands connected by dams in the Wisconsin river, by means of which a portion of the water of the river is turned into an artificial canal, from which both plaintiff and defendant draw their water. This canal and the dams were in process of construction by Garrison and Weller at the time the deed of October 5, 1860, from Harris to Weller was executed. Some time previous to the execution of the deed, Garrison, Jackson & Bensley had made a written contract with Weller to convey to him the mill site (now owned by plaintiff), together with "the right to draw and use from the race sufficient water, properly applied, to run four run of millstones, or water sufficient to drive the necessary machinery for a grist-mill of the capacity of four run of stones;" also the right to use the lands below for a tailrace. In this same contract Weller agreed to construct such a mill, and to pay one fourth part of the cost of enlarging the race, and one fourth of the cost of building and maintaining the dams and locks above the race, "in order to turn sufficient water in said race to propel said mill *and the saw-mill now in course of erection by Garrison, Jackson & Bensley.*" It is found by the court, as the fact undoubtedly was, that the deed of October 5, 1860, conveying 2,000 inches of water, was made in fulfilment of said contract, without new consideration.

When this deed was made, Weller executed a bond or contract back to Harris, agreeing to build and maintain one fourth part of canal, dams, and locks substantially as he had agreed in the previous contract, and providing for a forfeiture of his title in case of failure. All subsequent deeds from Weller to the plaintiff convey title expressly subject to the conditions and obligations imposed by this bond. It appears that the capacity of this canal from 1860 up to about 1886, when it was enlarged, was only about 23,000 to 25,000 cubic feet of water per minute, when the water flowed at its proper velocity.

All these facts immediately surrounding the original grant of water to Weller negative very conclusively the idea that the parties intended to convey 2,000 theoretical square inches of water. As we have seen, 2,000 theoretical square inches means a flow of 22,166 cubic feet of water per minute. This amount would practically take the entire supply of water which the canal was capable of carrying. The grantors had a saw-mill which they intended to operate with water drawn from this canal, which was of a size and capacity to draw at least twice as much water as Weller's grist-mill. Sane men would scarcely convey their entire available water-power, which they were building largely for their own use, in consideration of an agreement to pay one fourth part only of the expense of maintenance.

But it is said that the terms of the contract preceding the deed were merged in the deed, and that the contract cannot be received in evidence or considered for the purpose of modifying or changing the terms of the deed. Doubtless this is true. But the purpose of the testimony here is not to modify or change the terms of the deed, but to construe them, to interpret them, and ascertain their correct meaning. Parol evidence of surrounding circumstances is not admissible for the purpose of changing the

terms of a written contract, but where the terms of the contract are doubtful, and capable of several interpretations, it is well settled that evidence of attendant circumstances is admissible to enable the court to place itself in the situation of the parties, for the purpose of construing such doubtful terms.   No reason is perceived why the facts that the original contract was made and in existence, and that the deed was simply made in fulfilment of it, may not be shown as attendant circumstances, as well as facts resting purely in parol.  No clear understanding of the position and relations of the parties towards each other could be obtained if these facts were excluded from the evidence.

There are other facts in evidence, such as the size of the conduit or trunk built to convey water from the canal to the mill, the amount of water which was actually used by Weller and his grantees for many years, the prices which have been paid for the mill and power at the various sales,— all of which tend, with greater or less strength, to negative the idea that the theoretical inch of water was ever contemplated by the parties to any of the deeds as the measure of the grants.

The attending circumstances which we have so far considered may be called simply negative in their character. While they tend to show that the parties did not use the term " inch of water " as meaning a theoretical inch, they do not, perhaps, indicate affirmatively what meaning they attached to the term.   The question recurs, then, whether there is testimony of attendant circumstances which tends to show definitely what the understanding of the parties was as to the meaning of the term they used.   We know they had a definite purpose in using the words they did use, and, the words not having a fixed meaning, the question is, What was the meaning attached to them by the parties? The court found, as the facts evidently were, that Weller,

in constructing his flouring mill, built a flume leading from the canal to his mill, which led into a flume of larger size immediately under his mill, into which last-named flume he inserted three spouts, leading to three wheels, and constructed openings for the insertion of two other spouts of the same size to lead to two other wheels; that the three spouts so inserted and leading to the wheels were each twenty-two inches by eighteen inches gateage measurement. This flume and these openings were made at about the time of the execution of the deed from Harris to Weller, and they remained intact until long after Weller sold the mill, in 1874. The openings so provided for under the deed of 2,000 inches of water aggregate 1,980 square inches. Now, if this result was purely chance, it certainly was very remarkable. Here was the grantee preparing to utilize a grant of 2,000 inches of water, and with the knowledge, or at least without objection on the part, of his grantor, he prepares openings for the passage of the water granted, which aggregate in superficial area of aperture 1,980 inches. It is very manifest to us that this is not to be attributed to mere accident, but to design. We have no hesitation in holding on this fact that it was the manifest design of both parties that the water granted should be measured by the superficial area of the openings. There has been no actual measurement of the water continuing for years, in this case, as there was in the *Janesville Case*, and in the absence of such evidence we are fully persuaded that the preparation of the openings with a superficial area within a few inches of the grant must be considered a controlling circumstance in determining the proper construction of the grant. It is a circumstance which partakes of the nature both of an attendant fact and a practical construction by the parties of the grant. It is a practical demonstration that the parties meant by the term "2,000 inches" the amount of water which would be discharged through 2,000 superficial inches of aperature, with-

out adjutage, in the side of a flume, at a head of eleven feet.

We cannot accept the defendants' theory that the parties meant to add to this meaning an element of uncertainty, such as the retardation of the flow caused by machinery doing the ordinary work of a grist-mill. This retardation must be variable, depending on the kind of wheels used, the perfection of machinery, and the amount of work being done. It would be a constantly changing quantity. No witness could accurately testify to the amount of such retardation. We find nothing in the evidence that shows to our minds that the parties intended to add to the grant such an element of uncertainty, and we shall not do so. Doubtless the parties did not accurately know the amount of water which would be discharged through an aperture of 2,000 square inches at an eleven-foot head. Probably they would have been surprised to know that so great a volume of water would be discharged, but that they intended to so measure the volume we cannot doubt, and the fact that they did not know that the discharge would be so great cannot now affect the construction.

We hold that the grants of 2,000 inches of water under an eleven-foot head, as contained in the deeds in this action, under the evidence of the attendant circumstances, mean so much water as will, under a head of eleven feet, flow through a simple orifice of 2,000 square inches area in the side of a flume. This is a definite and certain amount. It is sixty-two per cent. of the theoretical discharge due the head. The theoretical discharge due the head is 22,166 cubic feet per minute; therefore the discharge to which plaintiff is entitled under its deeds is 13,743 cubic feet per minute, at a head of eleven feet.

There is no question as to innocent purchasers here. The plaintiff was charged with knowledge when it purchased that the term "inch of water" had not a fixed meaning, and it took its deed knowing that the term must

be construed. The judgment of the United States circuit court which denied reformation of the original deed is of no moment. No reformation is attempted by either party in this action. We have simply construed and found the meaning of the terms of the deed. We have not changed those terms.

*By the Court.*— Judgment affirmed upon defendants' appeal, and reversed upon plaintiff's appeal, and cause remanded with directions to render judgment for plaintiff in accordance with this opinion.

CASSODAY and PINNEY, JJ., took no part.