VERMONT SHADE ROLLER CO. *v.* BURLINGTON TRACTION CO. ET AL.

February Term, 1930.

Present: POWERS, C. J., SLACK, WILLCOX, and THOMPSON, JJ., and SHERMAN, Supr. J.

Opinion filed May 7, 1930.

490

492

*Marvelle C. Webber,* of Rutland, for the plaintiff.

*Chas. H. Darling* and *Guy M. Page* for defendant, People's Hydro Electric Vermont Corporation.

THOMPSON, J. This is an appeal in chancery. The case was heard on bill and cross-bill and answers thereto and facts found by the chancellor. Both parties excepted to the findings of fact, and both parties appealed from the decree. During the course of the litigation other parties acquired all the rights and· interests of the Burlington Traction Company and became party defendants, but the Burlington Traction Company is the defendant referred to in the findings and in our disposition of the case.

The case involves the diverse claims of the parties as to their legal and rightful ownership, use, and control of the water power of the westerly branch or channel of the Otter Creek river at Vergennes. The parties own or control all of the water power of said westerly channel. The rights of both parties come down from a common grantor, Gideon Spencer. The plaintiff owns the right formerly owned by one Elliott Sherrill. The original grants of this right were of sufficient water to carry two carding machines, a picking machine, and a fulling mill. The defendant owns the water power rights formerly owned by Herrick Stevens, F. M. Strong, and Charles D. Keeler, doing business under the name of the Vergennes Water Power Company, and hereafter referred to as the Water Power Company.

R. M. Clapp purchased the Sherrill water power right February 26, 1872. At that time there was a wooden dam across the westerly channel. The Water Power Company owned the dam and the greater part of the water power of said westerly channel. A flume, sometimes referred to as a canal, five hundred feet long, carried the water from the dam along the westerly bank of the channel. The flume was partly a box flume and partly a canal dug in the bank. There were several manufacturing plants operated by water power on said westerly bank. They all took the water for their power from said flume of the Water Power Company. One of those plants is referred to in the findings as the Haviland Plant. Its intake was located next north of the intake of the R. M. Clapp Plant.

On September 9, 1872, said R. M. Clapp and said Water Power Company executed the following indenture, hereafter called the Clapp Agreement:

"THIS INDENTURE made this 9th day of Sept. in the year of our Lord One Thousand Eight hundred and seventy-two between Mess. Stevens, Strong & Keeler, known as the Vergennes Water Power Co. of Vergennes, Vermont, of the 1st part and Rollin M. Clapp of Vergennes of the 2nd part, WITNESSETH:

That for the purpose of defining, ratifying & confirming a certain right of water power granted to Elliott Sherrill June 9, 1809 & January 15th 1823, and sold by said Sherrill to Francis M. Strong May 16th, 1866 and subsequently sold to R. M. Clapp, Feb. 26th 1872, being situated on the west side of the River and below the Bridge. The said Water Power Co. of the first part for themselves, their heirs and assigns do covenant with and confirm unto the said R. M. Clapp, his heirs and assigns the right to use as much water as will pass through two openings each ten inches (10 inches) square when drawn from a Flume, Penstock or Bulkhead at a depth of nine feet and six inches (9½ feet) below the upper side of bottom of the Bulkhead or Flume belonging to and now occupied by said Water Power Co.; Such right to be limited and qualified only as hereafter specified in the 2nd part of this agreement. The said Water Power Co. shall also provide Iron gates at the bottom of R. M. Clapp's flume or Bulkhead by which to determine the amount of water he has right to use and

which may also be used as flood gates and may be attached automatically to the wheel gate of the said R. M. C. & operated by & with the same so as not to obstruct the flow of water to the damage of the power below. The said Water Power Co. are also hereby made liable together with their heirs and assigns to pay three-fourths ($\frac{3}{4}$) of all the expenses of repairing, rebuilding and maintaining the Dam on the said premises and shall keep their Flume or Penstocks in such condition as not to waste water by leakage and shall appoint some one in their interest to transact all business with the said R. M. Clapp, his heirs or assigns, relative to the use of and joint occupation of the said water power; and shall allow said R. M. C. the right to improve his tail race so far as is necessary to secure a free discharge of the water as passing away from his wheel which may be located nine and one-half ($9\frac{1}{2}$) feet below the inside bottom of old flume and about 16 feet from the top of the Dam measuring to the center of the water wheel Bucket, but shall have no right to blast or deepen under said Co. flume.

"It is also agreed by R. M. Clapp, his heirs and assigns, of the 2nd part that he shall pay one-fourth ($\frac{1}{4}$) of all the expense of repairing, rebuilding and maintaining the Dam on the said premises keeping his Flume, Penstocks or Bulkheads in such condition as not to leak water and shall allow the said water power Co., their heirs and assigns, to enter upon the said premises and affix their gates as above specified and determine the amt. of water being used by R. M. Clapp, his heirs and assigns.

"And it is further agreed by R. M. Clapp that in consequence or in case of low water he may be restricted in his right of water by the said water power Co. or their legal representative to using only as much as will pass through one opening of ten inches (10 inches) square or half the amt. above specified, said restriction not to exceed sixty days in a year, excepting one year in three when it may continue ninety days, said amount of water also to be determined as before by the discharge through Iron gates at the bottom of said R. M. C's Bulkhead or flumes. Low water notice may be given the said R. M. Clapp, his heirs or assigns, by the water power Co. and when the time of such restriction is expired or its necessity removed the said

R. M. Clapp may use the full amt. of water as specified by the agreement of the said Stevens, Strong & Keeler and it is hereby and by these presents agreed by Mess Stevens, Strong & Keeler known as the Vergennes Water Power Co. and also R. M. Clapp all of Vergennes aforesaid that for ourselves, our heirs and assigns the above indenture embraces the full and final adjustment of the rights and requirements of each as pertaining to the water power herein described & set forth.''

Said indenture was duly signed, sealed, and acknowledged by the parties thereto, and recorded in the land records in the city clerk's office in Vergennes.

The defendant built a new concrete dam in 1910 and 1911 in place of the old wooden dam. It is ten feet farther down stream than the old dam was, but its elevation at the top is practically the same as the elevation at the top of the old dam.

About 1878 the power for the R. M. Clapp factory was changed by the Cranes, to whom it had been conveyed, and which has since been acquired by the plaintiff, and since then it has been taken directly from the forebay with the full knowledge and acquiescence of the other owners of power on the channel. The elevation of the bottom of the old flume intake was the same as the elevation of the present intake of the plaintiff, and there has been no change in the level of the intake since it was originally constructed in 1878. The chancellor found that the plaintiff, under the Clapp Agreement, is entitled to a head of water of fifteen and one-tenth (15.1) feet from the top of the new dam.

One of the questions in issue in the trial below was as to the type of ''opening'' contemplated by the parties to the contract of 1872 for measuring the water Clapp had the right to use. On this question the chancellor found as follows:

''Since the hearing before me at Burlington on February 9, 1927, when the draft of the tentative findings of fact were considered and discussed, I have carefully considered the requests, suggestions, and argument of counsel made at that time and since, together with the additional testimony since taken before me, and have carefully reviewed the record pertaining to such additional requests which relate particularly to the question of the type of orifice provided for by the contract of 1872 and contemplated by the

496

parties thereto, and also to the question of title. As to the title my conclusions as originally expressed in the tentative findings remain substantially unchanged, but, as to the type of orifice, I am satisfied that the record does not justify the conclusions stated in the first seven lines of Page 32 of the original draft of findings, and I now feel that the record of this phase of the case requires a fuller and more extended statement of my findings, and I find that at the time the Clapp Agreement was executed in 1872 there were and there are at the present time in general use two types of orifices for measuring water; one type being a square edge opening (see Deft's Ex. H. produced from the Haviland Plant), which will pass the minimum amount of water, that is, it has an efficiency of about 62% of the theoretical discharge; the other type of orifice so being in general use is a rounded or bell mouth orifice (see Plff's Ex. No. 56-D), which gives an efficiency of from 90% to 97% of the theoretical. Either type may be indicated by the description 'two openings each ten inches (10 inches) square.' "

The first seven lines of page 32 referred to are as follows:

"At the time the contract of 1872 was made and at the present time the standard type of orifice for measuring water is a square edge opening. This is a well established standard and was in use generally in the vicinity. The original gates installed about 1872 were of this type and such a one, (Defendant's Exhibit H) was produced from the Haviland Plant."

The chancellor further found:

"I find that an orifice 10 x 10 inches square with square edges and at the head herein found on Page 21 will discharge about 13.6 cubic feet of water per second, and that two such orifices will discharge about 27.2 cubic feet of water per second. I find that an orifice 10 x 10 inches square with rounded edges at such a head will discharge about 20 cubic feet of water per second, and two such orifices will discharge about 40 cubic feet of water per second. These figures are a little in excess of actual discharge for the respective type of orifices as the computation is made on the basis of a 16 ft. head while the head as determined on Page 21 herein is 15.1 ft.."

We consider first the questions raised by the defendant's appeal. While various issues were involved in the trial below, the questions brought to us by the defendant concern the construction of the Clapp Agreement as to the type of opening the parties thereto contemplated should be used for measuring the water Clapp had the right to use under said Agreement.

The importance of this question is apparent when it is borne in mind that an opening ten inches square with square edges, under the head the plaintiff is entitled to, has an efficiency of about 62 percent. of the theoretical discharge, while with rounded edges it has an efficiency of from 90 to 97 percent. of the theoretical discharge.

While the chancellor did not find specifically which type of opening the parties to the Clapp Agreement had in mind when they executed it, the decree is, "that the quantity of water to which the plaintiff, its succesors and assigns, are entitled under the Clapp Agreement of 1872 is as much water as will pass through two openings each ten inches (10 inches) square with rounded edges, such as is found in the Findings to be of the greater efficiency, at a head of fifteen and one-tenth (15.1) feet." The defendant questions the sufficiency of the findings to support the decree in this respect, and claims, that, on the findings, the decree should be revised so as to decree that the plaintiff is entitled under the Clapp Agreement to as much water as will pass through two openings each ten inches square with square edges, such as is found in the findings to be of the lesser efficiency, at a head of fifteen and one-tenth feet.

The plaintiff, in support of the decree, assumes in its brief that the Clapp Agreement is a grant or conveyance of water power, and invokes the rule that grants will be construed most strongly against the grantor and in favor of the grantee in cases of doubt, and cites cases where it has been held that, as between two methods of measuring the quantity of water granted, the method giving the larger quantity to the grantee will be taken as intended by the grant, in the absence of anything in the context or in the contemporaneous circumstances to show which method was intended.

■■ This rule, however, has no application to an instrument like the Clapp Agreement, which does not grant or attempt to grant any water power. This indenture, so-called, is simply a mutual agreement by the parties thereto to make definite and
■

certain that which was indefinite and uncertain, *viz.*, the quantity of water sufficient to operate two carding machines, a picking machine, and a fulling mill, that being the quantity owned by Clapp. The words of such an agreement are to be construed as the language of both parties, and shall not be taken most strongly against one, or beneficially for the other. *Beckwith* v. *Howard*, 6 R. I. 1, 8; *Denson* v. *Caddell*, 201 Ala. 194, 77 So. 720; *Bowen* v. *Beck*, 94 N. Y. 86, 89, 46 A. R. 124. Near the end of the findings, where the chancellor is dealing with the claim of the plaintiff that, as a riparian owner, it has a right to capture and use surplus and flood water, in addition to its rights under the Clapp Agreement, he says: "I find that the plaintiff is entitled to only such water power and to all such water power as is defined, ratified, confirmed and granted by the Clapp Agreement." This is the only place in the findings where the words "grant" or "granted" are used; and we think the word was used inadvertently here. The word "grant" is not used in the Clapp Agreement. The language of that instrument is that the Water Power Company "do *covenant* with and *confirm* unto the said R. M. Clapp his heirs and assigns the right to use as much water as will pass through two openings," etc. The verb "covenant" means "to agree (with)"; "to enter into a formal agreement"; and the verb "confirm" means "to ratify"; "to render valid by formal consent." *Web. New Intern. Dic.*

The plaintiff says that every inference will be drawn in favor of the decree; but the rule is not as broad as stated by the plaintiff. The rule is that it will be assumed on appeal that the chancellor inferred from the facts found any fact fairly inferable therefrom and necessary to support the decree. *Chamberlain* v. *Whitney*, 65 Vt. 488, 27 Atl. 72; *Pratt* v. *Page*, 32 Vt. 13, 17; *Farmers' Exchange* v. *Lowney Co.*, 95 Vt. 445, 449, 115 Atl. 507; *Roberts et al.* v. *Hughes Co. et al.*, 86 Vt. 76, 108, 83 Atl. 807; *Hitchcock* v. *Kennison*, 95 Vt. 327, 334, 115 Atl. 156; *Thomas* v. *Graves*, 89 Vt. 339, 344, 95 Atl. 642. The fact that must be inferred in the instant case to support the decree is that the parties to the Clapp Agreement had in mind that Clapp's quota of water might be measured by openings with rounded edges when they entered into the contract.

The plaintiff says that it might be rightfully inferred from the finding, ''The Clapp Wheel had a capacity to pass fully 200 square inches of water,'' that the parties so construed the agreement as to give Clapp forty cubic feet of water per second. Such fact cannot be fairly inferred from the finding. There is nothing in the Clapp Agreement which restricted Clapp as to the size or capacity of the wheel which he might install or use. He was restricted only as to the quantity of water he could use and the location of his water wheel with reference to the feet of head. The other parties to the Agreement could not prevent him from installing a wheel of any capacity he might choose; and no inference could be drawn against them because of the capacity of the wheel he installed.

Even if the suggested fact could be inferred, we would have to infer from it, aided by the finding that two openings each ten inches square with rounded edges will discharge about forty cubic feet of water per second, that the parties to the Agreement contemplated openings with rounded edges. But this would violate the rule that no inference can legitimately be based upon a fact the existence of which itself rests upon a prior inference. The only inferences of fact which the law recognizes are immediate inferences from the facts proved. *Wellman, Admr.* v. *Wales,* 97 Vt. 245, 254, 122 Atl. 659; *Cummings, Admr.* v. *Cambridge,* 93 Vt. 349, 352, 107 Atl. 114; *Powers et al.* v. *Trustees Caledonia County Grammar School,* 93 Vt. 220, 235, 106 Atl. 836; *Poronto* v. *Sinnott,* 89 Vt. 479, 483, 95 Atl. 647; *Fadden* v. *McKinney,* 87 Vt. 316, 322, 89 Atl. 351; *Comstock's Admr.* v. *Jacobs,* 84 Vt. 277, 282, 78 Atl. 1017, Ann. Cas. 1913A, 679; *Doolittle* v. *Holton,* 26 Vt. 588.

The plaintiff also says that it might be inferred that the parties construed the Clapp Agreement as giving the plaintiff forty cubic feet of water per second from the admission by the officers of the defendant in 1923 that the plaintiff was entitled to as much water as would pass through two ten-inch openings with a sixteen-foot head. If we could draw this inference, we would still have to infer from it that the parties to the Clapp Agreement contemplated openings with rounded edges, and, as we have just said, we cannot do this. Furthermore, the findings show that this admission had to do with the head of water the plaintiff is entitled to, which was a matter of controversy,.

and not to the type of openings by which the water should be measured.

The plaintiff further says that the decree in this respect might be sustained on an inference rightfully drawn from the provision in the Clapp Agreement that Clapp and the Water Power Company should bear the expense of upkeep of the dam in the proportion of one-fourth and three-fourths, and from the facts found that in 1872 the total capacity of the Water Power Company's flume was one hundred and sixty cubic feet of water per second, and the total demand and supply for all the then users, except Clapp, was one hundred twenty-one and one-half cubic feet of water per second. It argues that, since this left about forty cubic feet of water per second, which would be in the proportion of one-fourth to three-fourths, it can fairly be inferred that Clapp was to have this amount of water that was left after supplying the total demand of the other users. But, if this inference can be drawn, we would still have to infer. from it that the parties to the Clapp Agreement contemplated openings with rounded edges.

The plaintiff asks us to draw certain inferences from the evidence in support of the decree. This we cannot do. The only facts that can be inferred in support of the decree are those that can fairly be inferred from the facts found by the chancellor. We can do nothing but take the case as it comes to us and apply thereto the rules of law as we understand them. *County of Bennington* v. *Manchester*, 87 Vt. 555, 559, 90 Atl. 502.

We have considered carefully all of the findings and have not found any fact or facts from which it can be fairly inferred that the parties to the Clapp Agreement intended that the amount of water which Clapp had the right to use might be measured by openings with rounded edges.

We will now consider the defendant's claim that, upon the facts found, the decree should be revised so that it will decree that the plaintiff is entitled to as much water as will discharge through two openings each ten inches square with square edges.

The chancellor found that about 1872 there were installed in the bottom of Clapp's flume or wheel box two iron gates ten by ten inches square with square edges, and of the type of defendant's Exhibit H. (the gate taken from the Haviland Plant),

except as to the size of the openings; that these gates were so placed in the bottom of the flume or wheel box as to be used and operate automatically as flood or waste gates to protect the canal banks and were used for that purpose. .

He further found that the gates might have been used as measuring gates, but was unable to find that they were ever used for that purpose. He states that they were not so placed as to measure the water passing into or from the water wheel while it was in operation, and the only way they could have been used for measuring the water would be to close the wheel gate and pass the water through the flume box and through these two gates or openings. There seems to have been some doubt in the chancellor's mind as to whether the iron gates were really placed in the bottom of Clapp's flume or wheel box for measuring the water Clapp had the right to use under the Agreement. We think, however, that the language of the instrument itself, construed in the light of the surrounding circumstances and the practical construction placed upon it by the parties, as shown by the findings, shows that it was the intention of the parties thereto to measure the water in the way which the chancellor finds was the only way it could have been measured by the iron gates in the bottom of the flume or wheel box.

The first part of the Clapp Agreement confirms unto Clapp the right to use as much water as will pass through two openings each ten inches square, under a certain head; "Such right to be limited and qualified only as hereafter specified in the 2nd part of this agreement." Then follows this clause: "The said water power Co. shall also provide Iron gates at the bottom of R. M. Clapp's flume or bulkhead by which to determine the amt. of water he has right to use and which may also be used as flood gates and may be attached automatically to the wheel gate of the said R. M. C. and operated by and with the same so as not to obstruct the flow of water to the damage of the power below." ·

The second part of the Agreement restricted Clapp, in case of low water, "to using only as much (water) as will pass through one opening of ten inches square or half the amt. above specified, * * * said amount of water also to be determined as before by the *discharge* through Iron gates at the bottom of said R. M. Cs bulkhead or flumes."

502

There are certain well-established rules for the construction of written instruments to ascertain the intention of the parties which are applicable to this case. One rule is that it is the duty of the court, if possible, to construe the instrument so as to give effect to every part, and form from the parts a harmonious whole. *Hydeville Co.* v. *Eagle R. R. & Slate Co.*, 44 Vt. 395, 401; *Crosby* v. *Vt. Accident Ins. Co.*, 84 Vt. 510, 515, 80 Atl. 817; *McLean* v. *Windham Light & Lumber Co.*, 85 Vt. 167, 178, 81 Atl. 613. A second rule is that the practical construction placed upon the instrument by the parties by their conduct may be considered, if necessary. *Vermont Kaolin Corp.* v. *Lyons*, 101 Vt. 367, 377, 143 Atl. 639; *Clarke* v. *Mylkes*, 95 Vt. 460, 463, 115 Atl. 492; *Douglass & Varnum* v. *Morrisville*, 89 Vt. 393, 471, 95 Atl. 810; *Kopper* v. *Fulton*, 71 Vt. 211, 44 Atl. 92. Another rule is that the nature and condition of the subject-matter, the purposes sought to be accomplished, and the circumstances in which the parties contract tending to throw light on their apparent intention at the time the instrument was executed, may be considered. *Vermont Kaolin Corp.* v. *Lyons*, 101 Vt. 367, 376, 143 Atl. 639; *Ward's Admr.* v. *Preferred Accident Ins. Co.*, 80 Vt. 321, 325, 67 Atl. 821; *Rioux* v. *Ryegate Brick Co.*, 72 Vt. 148, 153, 47 Atl. 406; *Caverly-Gould Co.* v. *Springfield*, 83 Vt. 396, 402, 76 Atl. 39; *McGowan* v. *Griffin*, 69 Vt. 168, 170, 37 Atl. 298; *Jackson Milling Co.* v. *Chandos*, 82 Wis. 437, 52 N. W. 759, 762.

Applying these rules of construction to the Clapp Agreement, and construing the quoted clauses together, it is plain that the parties thereto intended that the water Clapp had the right to use should be measured by its discharge through the iron gates placed in the bottom of his flume or wheel box; and the fact that the openings were not placed so as to measure the water passing into or from the wheel while it was in operation, shows that it was the intention of the parties that the water should be measured when the wheel gate was closed. We know that the parties had a definite purpose in using the words they did use, and that they intended the water Clapp had the right to use should be measured by iron gates in the bottom of his flume or wheel box. The words used are consistent with the water being measured by its discharge through the iron gates when the wheel gate was closed; and, since it is found that that is the only way the water could have

been measured through the iron gates, we necessarily hold that such was the intention of the parties; for such construction gives effect to that part of the Agreement, and makes it operative. *Hydeville Co.* v. *Eagle R. R. & Slate Co., supra; Crosby* v. *Vt. Accident Ins. Co., supra.*

The Clapp Agreement is couched in common and clear language, and, if nothing appeared to the contrary, we think we would violate no rule of construction in holding that the ordinary acceptation of the words "two openings each ten inches square" is openings with square edges; but an ambiguity arises as to the type of opening contemplated by the parties to the Agreement from the finding that either openings with square edges or openings with rounded edges "may be indicated by the description 'two openings each ten inches square,' " and from the failure of the chancellor to find which type of opening the parties had in mind when they executed the Agreement. We think, however, if the Agreement is construed in the light of the circumstances attending its execution and of the practical construction placed upon it by the parties by their installation of the iron gates, as shown by the findings, their intent in this respect is manifest.

The iron gates installed in the bottom of Clapp's flume or wheel box about 1872, which would be about the time the Agreement was executed, were of the size specified in the Agreement for measuring the water Clapp had the right to use, and they were placed in the bottom of the wheel box where the agreement specified they should be placed for measuring that water. They had square edges and were of the type of defendant's Exhibit H, except as to the size of the openings. Defendant's Exhibit H is a rectangular iron gate six by ten inches with square edges, which was taken from the wheel box of the Haviland Plant. It, with a piece of the wheel case to which it was attached, was before us when this case was argued, and was inspected by us. Its structure indicates that there was formerly a door which slid over the opening.

The iron gates were attached to the gate of Clapp's water wheel so as to operate automatically with it as flood or waste gates to protect the canal banks, and were used for that purpose. The Agreement specified that they might be used as flood gates and might be attached automatically to the wheel gate and be operated by and with it. Their use as flood gates is

obvious. It was the custom of the Water Power Company, when the plants taking water from its flume were being operated, to maintain the water in the flume at the same level with the water in the pond at the dam and to the elevation of the top of the dam. The flow of the stream, even in stages of medium and low water, was sufficient to maintain this elevation of water in the flume if the users did not use more water than they had the right to use. It naturally followed, in case a wheel was shut down, unless there was an arrangement whereby there was a free discharge through the wheel box of practically the same amount of water as was discharged through the wheel when it was running, the water would set back into the flume, overflow it, and damage its banks. This is why the iron gates were used as flood gates. When the Clapp water wheel was running the iron gates were closed. When the wheel gate was closed, the iron gates were automatically opened, and as much water would discharge freely through them as Clapp had the right to use.

It is apparent from the findings that these gates were installed either a short time before or after the execution of the Clapp Agreement, and while Clapp owned the Sherrill water power right. Clapp bought the Sherrill right the last of February, 1872. The chancellor found that these gates "were installed in the bottom of Clapp's flume or wheel box," so they must have been installed after he bought the water power.

It is an outstanding fact that about the time of the execution of the Clapp Agreement iron gates or openings with square edges were known and used by the parties thereto. The installation of such gates in the Clapp flume or wheel box establishes this fact. The installation of these gates and of similar gates in the Haviland Plant shows that gates with square edges were known and used in the vicinity. Another significant fact is that it does not appear from the findings that any other kind of gate was installed in the Clapp flume or wheel box by which Clapp's quota of water could be measured. There is no fact found by the chancellor from which it can fairly be inferred that at that time iron gates or openings with rounded edges had ever been used or known by the parties to the Agreement, or in that vicinity.

If the installation of iron gates with square edges in Clapp's wheel box in such accord with the provisions of the

Clapp Agreement for installing iron gates therein was purely chance, it was remarkable; but it is evident to us that the installation of such gates is not to be attributed to mere accident, but to design. We have no hesitation in holding on these facts that it was the manifest design of both parties to the Agreement that the water Clapp was entitled to use should be measured by such gates.

It is true that the chancellor was unable to find that the gates installed were ever used for measuring the water; but this is not strange when we consider the number of years that have elapsed since the gates were installed; that in 1878 the intake of this power was moved from the Water Power Company's flume to the fore bay; and that the plaintiff for years prior to 1910 purchased of, and paid rent to, the defendant and its predecessor in title for fifty inches of water in addition to its rights under the Clapp Agreement. In the absence of such finding, we are fully persuaded that the installation of the iron gates with square edges in such accord with the provisions of the Agreement for their installation must be considered a controlling circumstance in determining what the parties meant by the use of the words "two openings each ten inches square." It was a practical construction of the Clapp Agreement by the parties thereto that they meant that Clapp should have the right to use as much water as would discharge through two openings each ten inches square with square edges in the bottom of his flume or wheel box, under a head of sixteen feet from the top of the old dam.

The same practical construction of the Clapp Agreement by the parties in the instant case when they installed a measuring device several years ago to measure the amount of water the plaintiff is entitled to under the Agreement, is equally controlling.

The chancellor found that about 1917 an arrangement was made under which the defendant constructed and installed a measuring box and weir at the end of plaintiff's tail race for the purpose of determining whether the plaintiff was using more water than it was entitled to use under the Clapp Agreement. This was the outgrowth of previous litigation. The measuring box and weir were so constructed as to measure the water passing through the plaintiff's wheel in excess of the amount that would discharge through two openings each ten

inches square with square edges. Mr. Nightingale, who was the plaintiff's hydraulic engineer, represented the plaintiff in the installation of this device. He assented to and approved the construction and installation of the measuring box and weir, including the location, type, and size of the two orifices or gates in the bottom of the measuring box, as proper and standard construction and installation to measure the water to which the plaintiff was entitled under the Clapp Agreement. The chancellor further states: "I find such to be the facts concerning this measuring device and weir as originally constructed if the plaintiff's quota of water is determined to be the discharge through two orifices 10 x 10 inches square with square edges. I do not find, however, that Mr. Nightingale had any authority to waive or modify on behalf of the plaintiff any of the terms or provisions of the agreement of 1872, or to waive any of the rights of the plaintiff thereunder." The measuring box and weir remained at the end of plaintiff's tail race as late as August, 1925, although at that time it was not in position and condition to measure the water accurately.

The plaintiff, in its pleadings, relies upon its ownership of the Sherrill right as "ratified, confirmed, defined, and interpreted" by the Clapp Agreement, and claims that it is entitled to the right to use as much water as will pass through two openings each ten inches square, under a sixteen-foot head.

It was the duty of Mr. Nightingale, as the representative of the plaintiff in seeing that a proper measuring box was installed for measuring the plaintiff's quota of water under the Clapp Agreement, to construe that instrument and determine what type of opening the parties thereto contemplated by the words "two openings each ten inches square," whether openings with square edges or openings with rounded edges; and the plaintiff is bound by what he did. He had the authority to do this, as his authority was, *prima facie,* coextensive with the business intrusted to his care, and would not be narrowed by limitations not communicated to the defendant. *Damon* v. *Hinckley Fibre Co.,* 96 Vt. 528, 530, 121 Atl. 579; *Chase* v. *Robinson,* 86 Vt. 240, 244, 84 Atl. 867; *Frost* v. *North British, etc., Ins. Co.,* 77 Vt. 407, 412, 60 Atl. 803. As is said in *Kingsley* v. *Fitts,* 51 Vt. 414, 416: "The scope of an agency is to be determined not alone from what a principal may have told the agent to do, but from what he knows, or in the exercise of

ordinary care and prudence ought to know, the agent is doing in the transaction.'' Mr. Nightingale's assent to and approval of the openings or gates with square edges in the bottom of the measuring box ''as proper and standard construction and installation to measure the water to which the plaintiff was entitled under the Agreement of 1872,'' was a practical construction by the plaintiff that the words ''two openings each ten inches square'' meant openings with square edges. This construction did not waive or modify any of the terms or provisions of the Clapp Agreement or waive any of the rights of the plaintiff thereunder. Its only effect was to define what the plaintiff understood the parties to the Agreement meant by the words they used. There certainly can be no more weighty evidence in the interpretation of the Agreement, so far as it relates to the type of opening for measuring the water, than this practical construction given to it by the parties to this suit themselves; and we have no hesitation in adopting it. *Thompson* v. *Prouty*, 27 Vt. 14; *White* v. *Amsden*, 67 Vt. 1, 13, 30 Atl. 972. In *Thompson* v. *Prouty*, Bennett, J., in speaking of whether a contract should have a certain construction, said: ''I, for one, should have some doubts, * * * * * but the defendant having given a different practical construction to it, we are disposed to adopt his in that particular.''

We hold, on the findings, that the quantity of water to which the plaintiff, its successors and assigns, are entitled under the Clapp Agreement of 1872 is as much water as will pass through two openings each ten inches square with square edges at the head of fifteen and one-tenth (15.1) feet at the top of the new dam; and the decree should be revised to conform with this holding.

The decree should further provide that the defendant may install and maintain iron gates or openings at the bottom of the plaintiff's flume or bulkhead by which to determine the amount of water the plaintiff has the right to use under the terms of the Clapp Agreement, and may enter the premises of the plaintiff to determine the amount of water being used, all this as provided by the terms of the Clapp Agreement of 1872.

The defendant has briefed various exceptions to the findings and to the failure to find in certain respects as requested, but in view of the disposition of this phase of the case, it is not necessary to consider the questions so raised.

We consider now the question raised by the plaintiff's appeal. The plaintiff claims that, as a riparian owner, it has a right to capture and use surplus and flood water of the westerly channel in addition to its rights under the Clapp Agreement. The chancellor found "that the plaintiff is entitled to only such water power and to all such water power as is defined, ratified, confirmed and granted by the Clapp Agreement of 1872, and the defendant is the owner of the reversion and fee." The first paragraph of the decree conforms with this finding, and it is from this paragraph of the decree that the plaintiff appealed.

It is very doubtful if this claim of the plaintiff is raised by the pleadings, but much evidence was received on this question, it was fully considered by the chancellor, it has been exhaustively briefed and argued by the parties, and, as we think it is for the interest of all to have this question decided and this litigation ended, we have decided to consider it.

The plaintiff excepted to the above finding on the grounds that it is based upon inadmissible testimony admitted under its objections and exceptions; that, in substance, it restricts the plaintiff, as a riparian owner, from the right to use surplus and flood water to which it is entitled under the law; and that the defendant is not the owner of the reversion, or at least not of the reversion of the whole.

Many conveyances involving the titles of the parties were received in evidence, and many questions are raised as to the admissibility and construction of some of them. All the evidence relating to the titles of the parties was received solely on the question as to whether the plaintiff, as a riparian owner, has any water power rights in addition to those defined and agreed upon in the Clapp Agreement, and not for the purpose of settling the titles of the parties to any real estate. We do not consider any of these questions raised as to the titles of the parties either by exceptions to the admissibility of evidence or to certain findings as to title, as we think the right of the plaintiff to the use of the water power of the westerly channel is defined and limited by the original grants of the Sherrill water power right as ratified and confirmed by the Clapp Agreement, when construed in the light of the attending circumstances; and that the language of said grants and of the Clapp Agreement, so construed, supports the first clause of said finding.

It is conceded that the water power rights of both parties come down from a common grantor, Gideon Spencer. The finding that the only water or power rights on the westerly channel are those owned or controlled by the parties in this case is not challenged by either party.

The Sherrill water power right consists of grants of two separate rights. The first grant is a perpetual lease from Gideon Spencer to John Sherrill dated June 9, 1809. By this instrument Gideon Spencer granted and leased to John Sherrill the upper room in his grist-mill then occupied by the said Sherrill "together with the right of taking so much water as will carry his two carding machines and one picking machine" until a new saw-mill should be erected on the waters of Otter Creek near the head of the Falls, and said Sherrill was given the right then to build a convenient room above and over said saw-mill for two carding machines and one picking machine, with the right of drawing so much water below said saw-mill, in some place convenient as well for him as for the owners of the saw-mill, "as will be sufficient to carry the aforesaid machines." The lease also provided for the payment annually of a yearly rent, with a clause of forfeiture in case of default on the part of the lessee.

The second grant is a warranty deed of land and water power from Gideon Spencer to Seviah Brush dated June 19, 1815, and conveyed to said John Sherrill by Seviah Brush by her warranty deed dated January 15, 1823. The deed to Seviah Brush conveyed two parcels of land formerly occupied by one Lyman Hill. One parcel is described as follows: "Also that land on which is the Fulling Mill under the saw Mill on the West side of the said Bridge occupied by said Lyman until his death with the privilege of sufficient water to carry said Mill."

 Gideon Spencer, as the owner of all the water power of the westerly channel, had the right to convey that power as he chose. He might convey either the land without the water power, or the water power without the land, or a qualified and limited right to the water power. *Rood* v. *Johnson*, 26 Vt. 64, 71; *Miller* v. *Lapham*, 44 Vt. 416, 432; *Ashley* v. *Pease*, 18 Pick. (Mass.) 268, 273. In *Miller* v. *Lapham*, this Court said: "Being thus the owner of the paper-mill and grist-mill, and of the power that drove the same, Salmon Norton, in

conveying them, could subject either mill to such limitations in respect to the power conveyed, and to the use of the power, as he saw fit, or make the power conveyed to one servient to that conveyed to the other. It was inherent in him to carve out just such estate and power to either mill as he chose." In *Ashley* v. *Pease*, Chief Justice Shaw said: "General ownership embraces the right to use the whole of the water power, to every extent and for every purpose to which it can be legally used. If having thus the unlimited *jus disponendi*, the owner chooses to grant, and the grantee chooses to accept a grant, either of the land without the water privilege, or this without the land, or a qualified and limited right to the water power, there is no legal impediment to such a grant, nor will it be controlled by the general presumption in relation to the rights of riparian proprietors." In the earlier days, grants of water power were made frequently of so much water as would carry or operate a particular kind of mill or machine; and it has been held generally that, in the absence of restrictive words, the language of such grants was used to describe and limit the quantity of water power conveyed, rather than to limit the manner in which, the purpose for which, or the place at which the water was to be used. *Adams* v. *Warner*, 23 Vt. 395, 410; *Rood* v. *Johnson*, supra; *Miller* v. *Lapham*, supra; *Albee* v. *Huntley*, 56 Vt. 454, 457; *Hartford Woolen Co.* v. *Bugbee*, 76 Vt. 61, 64, 56 Atl. 344; *Sowles* v. *Minot*, 82 Vt. 344, 355, 73 Atl. 1025, 137 A. S. R. 1010; *Fowler* v. *Kent*, 71 N. H. 388, 52 Atl. 554; *Tourtellot* v. *Phelps*, 4 Gray (Mass.) 370; Note, Ann. Cas. 1916D, 1007.

The grantees of the original grants of the Sherrill water power right accepted and took a limited quantity of water; so much as was then sufficient to carry two carding machines, a picking machine, and a fulling mill. That was the extent of their right to the use of the water power of the westerly channel, and is the extent of the right of the plaintiff as defined, ratified, and confirmed by the Clapp Agreement. When Clapp became the owner of the Sherrill water power right, and it was to be used for another purpose, facts were required to determine the amount of water that would carry the machines and fulling mill described in the conveyances of Gideon Spencer. This naturally led to the Clapp Agreement wherein it was agreed that the amount of water that would satisfy the grants was as much water as would discharge through two open-

ings each ten inches square, under a certain head. That the parties to the Agreement intended that this method of measuring the water should for all time fix the amount of water that the owner of the Sherrill right was entitled to, is evidenced by the last paragraph of the Agreement: "And it is hereby and by these presents agreed * * * that for ourselves our heirs and assigns the above indenture embraces the full and Final adjustment of the rights and requirements of each as pertaining to the water power herein described and set forth."

We hold that the finding "that the plaintiff is entitled to only such water power and to all such water power as is defined, ratified, confirmed, and granted by the Clapp Agreement of 1872" is sustained by the evidence.

There may be some question as to the last clause of the finding of the chancellor and of the first paragraph of the decree, "and the defendant is the owner of the reversion and fee."

The question of the ownership of the reversion and the fee is not raised by the pleadings, and, as it has not been necessary for us to consider it in the disposition of this phase of the case, we think it would be better if this clause is struck from the decree, and it may be done.

*Decree reversed, and cause remanded with mandate that there be a new decree in accordance with the views herein expressed. Let the defendant recover its costs in this Court.*